[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 323 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 324 
These appeals arise out of a case involving the formation of a partnership to mine coal, its subsequent dissolution, and the rights and duties of the partners in connection with the partnership. The factual issues were complex and the trial judge referred the matters to a special master, and later adopted his report "in toto," even though both sides filed exceptions to it.
Harry D. Lees, one of the partners in a partnership known as Davis, Terrell, Killian Associates (DTK), filed suit in his behalf, and on behalf of twelve other individuals who were members of the partnership, and designated them as co-plaintiffs, although none of the other co-plaintiffs agreed to join the suit. A.E. Burgess and Charles Burgess, who were also members of the partnership, were not named as co-plaintiffs, however.
Lees named as defendants A.E. Burgess, Charles Burgess, both individually and as partners d/b/a Burgess Brothers, and Burgess Mining Construction Corporation (Burgess Mining).
Lees sought damages in the amount of $1,669,681; Burgess Mining filed a counterclaim aganst DTK, Lees, and other named partners and sought $300,000 for services allegedly provided by the corporation to the partnership.
After numerous motions by both sides and several amendments to both the complaint and the counterclaims, a special master was appointed, and the case was heard for eight days by the special master, who issued a report with recommendations. All parties filed exceptions to the special master's report and recommendations, and these exceptions were argued before the circuit court, which overruled all the objections and adopted the report "in toto". The circuit court entered a judgment in favor of Lees and against Burgess Mining for $21,383 (involving coal sales subject to an offset for management fees); a judgment for Lees and against Burgess Brothers for $16,460 (for overcharge on equipment rented to DTK); and a judgment for Lees and against A.E. Burgess for $9,451 (Lee's distributive share of DTK partnership funds). The final judgment set the special master's fee at $10,000, and taxed the costs to the defendants.
Lees appealed in his own behalf and on behalf of DTK. The defendants also appealed. We affirm, in part, and reverse, in part.
 I. THE FORMATION OF DTK
The special master included the following findings in his report concerning the formation of DTK:
 "Burgess Mining is a substantial coal strip mine operator that has been in business *Page 325 
for a number of years. Its principal stockholder and chief executive officer is A.E. Burgess. In the summer of 1974, Burgess decided to form a partnership composed of some of Burgess Mining's key personnel to operate a strip mine. The purpose was to provide additional compensation to employees of Burgess Mining selected by A.E. Burgess.
 "A.E. Burgess contacted Harry Lees and discussed with him the proposed operation. Lees was retired at that time and was not an employee of Burgess Mining. He had been in the strip coal mining business in Alabama for a number of years. He had been an owner-operator of a small operation and had worked for larger companies. He and A.E. Burgess were friends and had known each other for a long time. They were partners in the coal mining business in 1947 and 1948. Lees operated a small strip mine in partnership with Johnny Crim until he retired in 1973. Burgess offered Lees a partnership interest in the proposed partnership, if he would be the superintendent of mine operations.
 "In September of 1974, there was an organizational meeting at Burgess Mining offices attended by several of the proposed partners, including Lees. A.E. Burgess was not present at this meeting. He had previously outlined his plans to Prescott, the administrative vice president of Burgess Mining. Prescott reviewed these plans with those present. A written agreement of the partnership, subsequently prepared by Prescott and dated September 2, 1974, was executed by W.J. Davis, T.H. Terrell, M.L. Killian, E.W. Lackey, J.M. Phillips, A.E. Burgess, C.R. Burgess, A.E. Burgess, Jr., W.E. Prescott III, H.D. Lees and C.E. Henderson. Two amendments dated March 1, 1976 were signed by all of the partners adding as partners: H.L. Wilson, L.A. Woodall, Ben F. Robinson and A.J. Ryan. All of the partners, except Lees, executed an amendment dated January 19, 1977, adding R.D. Whatley as a partner. Lees was not informed of this amendment and did not agree to it. The name given the partnership was `Davis, Terrell, Killian and Associates' (DTK).
 "None of the partners invested any initial capital in DTK. DTK borrowed $115,000.00 with which to begin business. At least $10,000.00 was borrowed from A.E. Burgess and $94,000.00 from Burgess Mining. All of it was repaid with interest during 1975.
 "The partnership agreement provided that decisions would be made by a majority of the partners. However, except for the organizational meeting and one other meeting in September of 1977, no formal meetings were held prior to dissolution. No minutes were kept of any meeting. Except for the partnership agreement itself and the amendments recited above, no decision of the partnership was ever made or ratified by a majority of the partners as provided in the agreement. From time to time, various members of the partnership met informally at Burgess Mining office and discussed partnership affairs, and occasionally partnership affairs were discussed at social gatherings with some of the partners. At an informal meeting, when Lees was not present, some of the partners selected Prescott as the managing partner of DTK. However, A.E. Burgess effectively controlled the business affairs of DTK and made its major business decisions.
 "DTK operated a strip mine at three different locations near West Blocton, Alabama, from January 1975 until October of 1977. The mines were in the Thompson seam until August 1976, the Atkins seam until December 1976, and the Allis-Jones seam thereafter. DTK operated under the state permit issued to Burgess Mining until it was issued its own permit on December 1, 1975.
 "Lees was in charge of the mining operations and received a salary from DTK from the time it began mining until he retired in December of 1976. All of the other partners were employees of Burgess Mining, and none of them received any salaries from DTK." *Page 326 
 II. MANAGEMENT FEES FOR BURGESS MINING
The special master made the finding that DTK had no office and that all of its management functions, except the operations at the mines, were performed by Burgess Mining personnel in the normal course of their employment and without any additional cost to Burgess Mining. He found that the monthly statements distributed to partners, prior to December 1975, indicating the earnings of DTK, listed no expense for management fees and that there had been no agreement for DTK to pay Burgess Mining for its management services. In his findings, the special master stated that commencing with the year-end statement for 1975, T.H. Terrell and W.E. Prescott, acting upon instructions from A.E. Burgess, devised a formula for a management fee to be paid to Burgess Mining by DTK. The fee, as calculated under the formula devised by Terrell and Prescott, amounted to $110,857 for the year of 1975, and this fee brought strong objections from Lees. The special master found that the management fee computations for the year of 1976, ($122,384) and in the statement for October 31, 1977, ($95,406.41) lacked consistency in the items of overhead utilized. Recalculating the management fees for all three years, the special master determined that Burgess Mining was actually entitled to additional payments. In his report and recommendations to the court, he concluded:
 "DTK and Lees are not bound by the arrangments for payment for management fees. However, Burgess Mining performed substantial services for DTK and is entitled to reasonable compensation for them. The formula devised by Terrell and Prescott is a reasonable basis for determining the amounts due. The items included in the recapitulation [See Figure I] relate to coal production and the amounts shown by the recapitulation are fair and reasonable. As this amount is in excess of the amounts actually charged, the plaintiffs' claims in COUNT FIVE should be denied and Burgess Mining is entitled to recover on its counterclaim. The amounts due from DTK to Burgess Mining for management fees are:
 "1975 — $ 7,524.13 "1976 — $28,417.66 "1977 — $13,039.76"
The special master further recommended that:
 "[A]ny judgment rendered by the court be made directly on behalf of Lees and against the appropriate defendants for his proportionate interest in the partnership. In accordance with paragraph 16 (a) of the partnership agreement and paragraph 19 of the stipulation, Lees would be entitled to his proportionate share of any adjustments as follows:
 "1975 — 1/11 "1976 — 1/15 "1977 — 1/18"
Lees's proportionate share of the management fee owed Burgess Mining was set off against the additional amount which the special master found Burgess Mining owed DTK for coal sales (See Figure I[1] below for *Page 327 
the special master's calculations as they appear in the record). Burgess Mining argues that this recapitulation performed by the special master resulted in its claim against DTK being reduced from $48,981.55 to only $3,302.86.[2] Further, Burgess Mining asserts that as a general proposition of law, it is entitled to collect the full amount of its claim against DTK, i.e., $48,981.55, from Lees, who was a general partner of DTK. See e.g., Code 1975, §§ 6-7-70 and 10-8-52; Cleckler v.First National Bank, 204 Ala. 268, 85 So. 484 (1920). Hence, Burgess Mining maintains that Lees's judgment against it in the amount of $21,383.16 (See Figure I), should be eliminated and instead a judgment entered for it and against Lees in the amount of $24,296.06.[3]
Lees takes issue with the management charges made to DTK on the ground that the evidence does not justify the inclusion of officers' salaries or contributions to a pension fund in which he could not participate. Thus, he claims that his portion of officers' salaries ($5,459.87) and pension fund contributions ($1,841.78) paid by DTK to Burgess Mining should be disallowed and the judgment entered on his behalf against the mining company increased by $7,301.65.
At the outset, it is to be noted that a court accepts a master's findings of fact in non-jury actions unless clearlyerroneous; and to the extent the trial court has adopted the findings of a master, this same standard applies to an appellate review of these findings. Rule 53 (e) (2), Ala.R.Civ.P., and committee comments to Rule 53, Rule 52 Ala.R.Civ.P., and committee comments to Rule 52. In essence, a master's report is accorded the same weight as a jury verdict and, therefore, is not to be disturbed unless it is palpably and plainly wrong. Patterson v. Lovelady, 233 Ala. 554, 556,172 So. 646, 648 (1937).
Burgess Mining's contention that partners are jointly and severably liable for all debts and obligations of the partnership and that as a consequence, it may sue Harry Lees, individually, for the obligations of DTK, is correct as a general proposition of law. Under the circumstances of this particular case, however, the Court is of the opinion that the special master, in an effort to arrive at a fair accounting of the liabilities of the parties, was justified in apportioning to Lees his share of the additional management fees due Burgess Mining from DTK, and that the circuit court did not err in adopting the master's report in this regard. It should be noted that the special master concluded that DTK and Lees were not bound by the arrangement for payment of management fees, but, nevertheless, found that Burgess Mining had performed *Page 328 
substantial services for DTK and was entitled to reasonable compensation for those services. Because of the particular circumstances, we hold that the circuit court was entitled to apply equitable principles. In Moore v. Moore, 255 Ala. 393,51 So.2d 683 (1951), the Court stated:
 "It is a familiar principle that equity grants full relief when it has jurisdiction on an equitable ground to grant any relief. Having assumed jurisdiction of a part the court will determine all the interrelated equities of the whole. `Equity delights to do justice, and not by halves.' The bill in the instant case is based upon these fundamentals and will avoid multiplicity of suits."
255 Ala. at 401, 51 So.2d at 690. Indeed, equity must mold its decrees to suit the obvious necessities of each situation and possesses the power to do so. Bouldin v. City of Homewood,277 Ala. 665, 674, 174 So.2d 306, 314 (1965); see also Baker Sand Gravel Co. v. Rogers Plumbing Heating Co., 228 Ala. 612, 619,154 So. 591, 597 (1934). The Court holds, therefore, that the special master was free to fashion an appropriate remedy that was fair to all parties, including one that merely apportioned to Lees his individual share of the additional amount due Burgess Mining, particularly since all the partners except Lees had signed release forms releasing Burgess Mining and Burgess Brothers from all claims relating to DTK, and also, as found by the master, the other partners were key personnel in Burgess Mining and the partnership was formed to benefit these key personnel.
Although Lees insists that he is due an additional $7,301.65, he has failed to direct the Court to any evidence in the record which conclusively indicates that he is entitled to additional reimbursement and that the special master has specifically failed to account for it. Consequently, the court will not attempt a detailed examination of accounts for the purpose of finding errors not specifically pointed out, nor will the findings of the master, sustained by the trial court, be disturbed unless mistake or fraud is clearly shown. 1 C.J.S.Accounting § 44, at 689 (1936). Because the Court has not been directed to appropriate evidence supporting Lees's claim concerning management fees, the Court cannot conclude that the findings and recommendations of the special master as adopted by the circuit court were palpably wrong.
 III. THE EQUIPMENT
The special master made a finding that on December 31, 1974, T.H. Terrell signed a lease on behalf of DTK agreeing to rent from Burgess Brothers, a partnership comprised of A.E. and Charles Burgess, several items of equipment. The items of equipment included a front end loader[4], a bulldozer[5], and a dragline[6], with the monthly rental of $6,000, $7,000 and $12,500 respectively. The lease, however, contained no provision for DTK to acquire title to the heavy equipment. The special master further found that Burgess Brothers was formed for the sole purpose of obtaining title to the equipment and its only income was rent paid by DTK for the equipment. The monthly rent for the three pieces of equipment was later reduced by A.E. Burgess at the behest of W.E. Prescott and Charles Burgess, and a new lease executed on April 1, 1977. The equipment rent under the new lease was $2,500, $2,500 and $12,500 respectively. The special master noted in his findings that during the hearing, Lees made the statement that he had no knowledge of either of the leases until DTK was dissolved. The special master included the following comparison of the total cost of the equipment to Burgess Mining *Page 329 
and Burgess Brothers, and the total rent paid by DTK:

 "Costs to BM or BB Rent paid by DTK
Front End Loader $ 84,592.11 $179,500.00
Bulldozer 158,499.19 209,000.00
Dragline 447,281.06 425,000.00
 ----------- -----------
 $690,372.36 $813,500.00

In his report, the special master noted that expert testimony in the record showed the fair market value of the three items of equipment as of October 26, 1977, to be within the following ranges:
 Front End Loader $ 55,000 — $ 60,000
 Bulldozer 75,000 — 82,500
 Dragline 525,000 — 575,000

Likewise, he included in his report that expert testimony contained in the record established a reasonable monthly rental rate for the equipment on a short term basis to be within the following ranges:
 $ 5,000 per
 Front End Loader $ 4,000 — shift
 $ 6,000 per
 Bulldozer 5,000 — shift
 $12,500 per
 Dragline 10,000 — shift

As to other equipment, the special master found that DTK purchased some items and rented others or exchanged the use of equipment with Burgess Mining. Consequently, the special master made the following conclusions and recommendations concerning the issue of equipment which the circuit court adopted:
 "The plaintiffs contend that DTK should have acquired title to the three pieces of equipment described in COUNTS SIX, SEVEN and EIGHT. However, under paragraph 19 of the stipulation, Lees' rights are determined by paragraph 16 (a)[7] of the partnership agreement. Any equity DTK may have had in the equipment is not included in the amounts due under paragraph 16 (a) and the issue of title or equity in the equipment is moot as to Lees. However, DTK and Lees are not bound by the rental arrangements that were made. Burgess Brothers is entitled to a reasonable rent for the use of the equipment. Under the circumstances in this case, the rent agreed to by A.E. Burgess, Charles Burgess, and William Prescott on April 1, 1977, is a reasonable rental rate for the use of the equipment for the entire time it was used by DTK. Therefore, DTK is entitled to a refund of rent from Burgess Brothers, A.E. Burgess and Charles Burgess as follows:
"1975 1976 1977
Front End
 Loader $42,000.00 $42,000.00 $10,500.00 Bulldozer 54,000.00 54,000.00 13,500.00 Dragline -0- -0- -0- ---------- ---------- ---------- $96,000.00 $96,000.00 $24,000.00"
Burgess Brothers asserts that the equipment rental judgment against it is not supported by any evidence and must be set aside. Both Grief Bros. v. Stacey, 257 Ala. 196, 58 So.2d 122
(1952), and Dent v. Foy, 214 Ala. 243, 107 So. 210 (1925), are cited by Burgess Brothers for the proposition that the usual presumption of correctness afforded a special master's finding is not applicable where the determination of specific issues depends on opinion evidence. *Page 330 
The rates testified to by the experts as to short term, fair monthly rental rates for the front end loader and bulldozer, did exceed the rental amount set by the special master. While the special master concluded that DTK and Lees were not bound by the equipment arrangements, he did find that Burgess Brothers was due reasonable rent for DTK's use of the equipment. Accordingly, the special master relied upon the rental rate set by the April 1, 1977, lease agreed to by A.E. Burgess, Charles Burgess and W.E. Prescott, as a reasonable rate for the long term as opposed to short term use of the equipment by DTK and recommended a refund in DTK's favor from Burgess Brothers.
Moreover, the Court is cognizant that while there is no rule which says that a partner may not do business with his own firm, including renting property to the firm, 68 C.J.S.Partnership, § 100 (1950), a partner may not derive a secret personal profit out of the business or transactions of the firm without the consent of his co-partners. 68 C.J.S. Partnership, § 99, at 539 (1950). There is no evidence in the record to suggest that A.E. Burgess or Charles Burgess either obtained the consent of the other members of DTK prior to DTK's leasing equipment from Burgess Brothers or informed them of the substantial monetary and tax benefits which would accrue to Burgess Brothers as a result. Thus, the Court is of the opinion that the special master, in an attempt to balance the equities between the parties, was warranted in recommending that the rental value of the front end loader and bulldozer be based on the terms of the April 1, 1977, lease and that the adjusted rental value be retroactive to the date the equipment was first used.
Lees argues on cross appeal that the special master erred as a matter of law with regard to the equipment by concluding that "[a]ny equity DTK may have had in the equipment is not included in the amounts due under paragraph 16 (a) and the issue of title or equity is moot as to Lees." He asserts that the machines are presumed to be the property of DTK because they were purchased with funds from DTK even though the title or other interest was acquired in the name of Burgess Brothers.See Code 1975, § 10-8-70 (b). Lees states that "[e]xcept for Mr. [A.E.] Burgess's self-dealing for Burgess Brothers, DTK could and would have bought the machines and acquired title to the loader and bulldozer and an equity in the dragline, and these values would have been part of the capital contribution to DTK and within the coverage of paragraph 16 (a) of the partnership agreement." See § 10-8-43 (1).
The argument by Lees is that irrespective of the leases the equipment was in essence purchased with partnership funds, thereby making the equipment partnership property. Ordinarily, personalty purchased from a third person with partnership funds is regarded as firm property; however, the mere use of partnership funds in the acquisition of personalty absent an agreement to the contrary does not necessarily make the personalty property of the partnership. 68 C.J.S. Partnership, § 70 (c) (1950). Hence, the question is one of intention: whether or not the facts and circumstances indicate that the personalty acquired with firm funds was intended to become partnership property. Id. at 503.
Despite Lees's protestations that he thought the arrangements would ultimately result in DTK's acquiring title to the equipment items in question, the findings of the special master, as supported by the record, indicate that A.E. Burgess and Charles Burgess had no intention that the equipment was to become DTK property; they intended instead that the equipment would become and remain the property of Burgess Brothers. Consequently, the special master's recommendations as to the equipment, which were adopted by the circuit court, are fully supported by evidence in the record.
 IV. COAL SALES AND WASHER LOSS
The special master noted in his findings that the coal which DTK began mining in January 1975 was shipped to the *Page 331 
Black Diamond Coal Mining Company washer under Burgess Mining's contract. (A washer separates the coal from rock, clay, dirt, and high ash material, and the reduction in weight because of the removal of these extraneous items is referred to as "washer loss"). He found that after being weighed, DTK's coal was commingled with Burgess Mining's coal and washed and that Black Diamond made monthly weight reports to Burgess Mining which showed the amount of coal received from each pit, and the amount of coal washed, as well as the percentage of washer loss of all the coal washed that month. The computations, according to the special master, assumed that DTK and Burgess Mining coal possessed the same percentage of washer loss as the percentage for their coal combined. Burgess Mining and DTK received separate checks every month from Black Diamond for the purchase of coal each month.
When DTK began mining coal in January 1976, the base price per ton of coal was $20.46, with a bonus of 25 cents per ton for every one percent under twenty-five percent of washer loss, and a penalty of 25 cents per ton for every one percent over twenty-five percent of washer loss. During the time DTK was mining coal under the Black Diamond contract, Black Diamond paid the Alabama severance tax and all the royalties due the United Mine Workers of America (UMWA). Black Diamond resold the coal it purchased from Burgess Mining and DTK to United States Steel Company (U.S. Steel).
In June of 1976, U.S. Steel terminated its contract with Black Diamond and contracted with Burgess Mining to supply the company with coal. The formal contract executed between U.S. Steel and Burgess Mining on November 1, 1977, provided for a base price of $31.38 per ton of washed coal and a bonus or penalty based upon moisture and ash content, but no adjustment for washer loss. In addition to other requirements and restrictions, the contract provided that U.S. Steel would reject any coal that did not conform to certain specifications for ash and sulphur content, and a quality known as the free swelling index (FSI). Moreover, Burgess Mining was required to produce a specified amount of washed coal per month.
In his findings, the special master noted that after July 1, 1976, Burgess Mining purchased all of the coal produced by DTK and resold it to U.S. Steel, yet continued to deliver the coal to the Black Diamond washer along with the coal it produced. Beginning in the summer of 1976, DTK mined the Atkins Seam. The special master made the finding that A.E. Burgess wanted DTK to mine this particular seam because of the bottom layer of the seam which had a low ash content and a good FSI rating, despite the fact that the Atkins Seam produced higher washer loss than other seams.
Subsequent to DTK's mining the Atkins Seam, A.E. Burgess complained to Lees about the excessive dirt in the coal. Accordingly, on instructions from A.E. Burgess, W.E. Prescott devised a formula for the price to be paid to DTK by Burgess Mining which, the special master concluded, was designed to force Lees to produce cleaner coal. This formula included a base rate of $20.46 per ton, with a penalty of $1.02 for each one percent over twenty percent washer loss, and no bonus. Charles Burgess computed the percentage of washer loss each month and reported it to T.H. Terrell, who in turn prepared monthly summaries of coal sales from DTK to Burgess Mining. The severance tax and royalties which had previously been paid by Black Diamond, were, after July 1, 1976, paid by DTK.
Concerning the coal sales issue, the special master found that upon receiving the July 1976 monthly statement in August 1976, showing the computations under the revised formula, Lees complained to A.E. Burgess and some of the other partners about the price Burgess Mining was paying DTK for coal. Consequently, in September of 1976, a meeting of some of the partners took place in Charles Burgess's office. Although Lees was present, A.E. Burgess was not; however, A.E. Burgess had advised some of the other partners that were *Page 332 
present at the meeting that DTK would be out of business unless it stopped shipping dirty coal. No action was taken at the meeting and the special master found that no minutes of the meeting were kept.
At the time Lees complained to A.E. Burgess in August of 1976, he also informed Burgess that he was quitting as mine superintendent of DTK. At A.E. Burgess's request, however, Lees remained long enough to train a replacement and retired on December 31, 1976.
Apparently at the request of Charles Burgess, A.E. Burgess agreed to adjust the price Burgess Mining paid DTK so that the penalty was not effective until the washer loss was over twenty-five percent. The other factors remained unchanged and the adjustment became effective on January 1, 1977. On July 1, 1977, U.S. Steel increased the base price it paid to Burgess Mining for coal. Subsequently, A.E. Burgess increased the base price Burgess Mining paid DTK from $20.46 to $21.46 per ton.
The special master found that for coal sales to Black Diamond, DTK had a bonus in 1975 of $41,939.12 and a bonus of $31,869.61 in 1976. For sales to Burgess Mining, the special master found that DTK incurred a penalty of $245,006.01 in 1976, and a penalty of $44,588.37 in 1977.
Concerning washer loss, the special master made a finding that Black Diamond operated a sampling program which it used to test the effectiveness of its washer and for other internal purposes. The testing program consisted of taking an occasional shovelful of coal from the top of a load while the trucks were being weighed, and placing the coal in a box. There was a separate box for each pit from which Black Diamond received coal, including a box for the pit operated by DTK. Each week, the contents of each box were mixed and five-pound samples then taken to Black Diamond's laboratory, where they were tested for various purposes, including washer loss. The special master found that these tests did not conform to the American Society for Testing and Materials (ASTM) standards, the generally accepted standards for testing in the industry, although the tests did conform to the usual practices in the southeast for the purpose of inhouse testing, the purpose for which the tests were used.
Black Diamond's weekly lab reports of these tests for DTK coal which were introduced as evidence by Burgess Mining, indicated that DTK's coal had a higher washer loss than that shown by the procedure used for determining payment. Using the results of these reports and the appropriate formulas for pricing, the special master calculated that DTK would owe Burgess Mining $1,192,008.08. He found, however, that Black Diamond's reports were based on an inadequate number of samples and were not routinely made known to either DTK or Burgess Mining, and therefore, concluded that the reports were never used or intended to be used for coal payment computations.
The special master further concluded that had the Black Diamond agreement continued, Burgess Mining would be indebted to DTK for washer loss adjustments in 1976 of $236,809.40, and in 1977 of $27,871.41. In addition, Black Diamond would have paid severance taxes of $2,678.80 in 1976, and $8,395.42 in 1977, and UMWA royalties of $33,936.11 in 1976, and $72,774.00 in 1977, which DTK was otherwise forced to pay.
Based on these findings, the special master made the following recommendations concerning coal sales and washer loss, which the circuit court accepted:
 "The pricing arrangements by which Burgess Mining paid DTK for coal was determined solely by A.E. Burgess, and was not an arm's length transaction. Neither Lees nor DTK is bound by the arrangement. The basis on which DTK sold coal to Black Diamond as it related to washer loss, severance taxes and UMWA royalties was fair and reasonable at the time DTK sold to Black Diamond and was also a fair and reasonable basis for determining price when DTK sold coal to Burgess Mining. The plaintiffs are entitled to the relief prayed for [in] counts two, three and four against Burgess *Page 333 
Mining for the difference between what was actually paid and the amounts that would have been paid, had the Black Diamond arrangement continued. Burgess Mining is not entitled to recover on the claims set out in paragraph 6 of its counterclaim."
The amounts due DTK by Burgess Mining for these adjustments totaled:
 1976 1977
 Wn.er Loss $236,809.40 $ 27,871.41
 Severance Tax 2,678.80 8,395.42
 UMWA Royalties 39,936.11 72,774.00
 ---------- ----------
 $279,424.31 $109,040.83

Thus, the special master recommended that a judgment be entered on behalf of Lees against Burgess Mining in the amount of $32,383.16. DTK's income adjustment in accordance with the special master's findings and recommendation and Lees's distributive share appear in Figure I.
Burgess Mining asserts that the judgment against it for coal sales is due to be set aside. Although Burgess Mining admits that DTK received less per ton under the July 1, 1976, contract signed by W.E. Prescott as managing partner for DTK, it argues that there is no evidence to sustain the finding that the price and terms of the Black Diamond contract, had it continued in force, represented the fair market value for the period of July 1, 1976, to October 1977.
The special master's findings and his recommendation based on those findings are substantiated by the unique circumstances of this case. After July 1, 1976, Burgess Mining purchased all of the coal produced by DTK and resold it to U.S. Steel. Although U.S. Steel's contract with Burgess Mining provided for a base price of $31.38 per ton for washed coal and a bonus or penalty based upon moisture or ash content, Burgess Mining continued initially to pay DTK the same as under the Black Diamond contract, i.e., $20.46 per ton, while substantially increasing the washer penalty and abolishing the washer bonus altogether. Moreover, DTK was required to pay its own severance taxes and UMWA royalties, which had previously been paid by the Black Diamond company. The Court interprets the special master's utilization of the Black Diamond agreement simply as a minimum price for purposes of effecting an accounting to restore to DTK the minimum washer loss adjustments to which he found the partnership entitled and which the Court believes he was authorized to do under the facts of this case. Consequently, the Court holds that the special master's recommendation is supported by the evidence.
As for Burgess Mining's counterclaim for washer loss, the Court likewise considers that under the evidence presented, the special master was correct in disregarding the Black Diamond testing procedure, a procedure which the Black Diamond company used not for computing coal payments, but for its own internal purposes, because it did not conform to ASTM standards.
Lees cross appeals as to the judgment entered in his behalf against Burgess Mining in the amount of $21,383.16, insisting that the judgment should have been entered against A.E. Burgess as well. He asserts that Burgess Mining's liability, as principal, cannot exist independently of A.E. Burgess's liability, as its agent, because it was A.E. Burgess as chief executive officer who did the things which led to the judgment against Burgess Mining. Indeed, this argument takes on added significance, as Lees suggests, in view of the fact that Burgess Mining is apparently a debtor under Chapter XI of the bankruptcy code.
The judgment entered against Burgess Mining by the circuit court, as recommended by the special master, was not predicated on the legal theory of respondeat superior, however. See e.g.,Larry Terry Contractors, Inc. v. Bogle, 404 So.2d 613 (Ala. 1981). The judgment amount was instead an accounting of the amount which the special master found Burgess Mining had profited on the washer loss adjustments at the expense of DTK and ultimately at the expense of Lees as a member of DTK. There was no evidence to suggest that the washer loss adjustments taxed to DTK by *Page 334 
Burgess Mining was being intercepted by A.E. Burgess, thus necessitating a recommendation by the special master that A.E. Burgess be disgorged of the washer loss adjustment paid to DTK by Burgess Mining. Consequently, the Court finds no merit in Lees's cross appeal concerning washer loss adjustments.
V. THE SETTING ASIDE OF THE SEVERAL AGREEMENTS BETWEEN DTK AND BURGESS MINING AND BURGESS BROTHERS
Central to the resolution of this appeal is a determination of the extent to which DTK could be bound under contracts found by the special master to be financially detrimental to the partnership. Burgess Mining and Burgess Brothers maintain either that Lees is estopped to contest the matters he complains of, or that he has ratified them by his acquiescence. Alternatively, they assert that one partner may not sue and recover damages from third parties based upon action taken by a majority of the partners and that the contracts entered into by W.E. Prescott as managing partner of DTK are binding and enforceable.
This Court has held that "[p]artners, in all the scope of the partnership business, in all dealings with others as to the partnership affairs or property, stand in a fiduciary relation, the one to the other, and are bound to the uberrima fides of such relation." Bestor v. Barker, 106 Ala. 240, 250,17 So. 389, 392 (1894); see also § 10-8-48 (a). In Goldsmith v.Eichold Bros. Weiss, 94 Ala. 116, 10 So. 80 (1891), Justice Stone expressed the characteristics of the special relationship among and between a partnership's members, which he said renders it "eminently a relation of trust":
 "All its effects are held in trust, and each partner is, in one sense, a trustee; a trustee for the newly created entity, the partnership, and for each member of the firm, who thus becomes a beneficiary under the trust. He is more; he is a trustee, and a cestui que trust. A trustee, so far as his own duties bind him; a cestui que trust, so far as duties rest on his co-partners. And it is sometimes said that each partner is both a principal and an agent; a principal, to the extent he represents his own interest, but an agent only so far as he represents his own co-partners."
94 Ala. at 119-120, 10 So. at 81. Likewise, the fiduciary responsibility of a managing partner to the other members of a partnership is particularly stringent; he must under all circumstances conduct business in the best interest of the partnership. 68 C.J.S. Partnership § 76 (1950); see alsoBelcher v. Birmingham Trust National Bank, 348 F. Supp. 61, 99
(N.D.Ala. 1968). Further, while it is acceptable for a partner to do business with his own firm, 68 C.J.S. Partnership, § 100 (1950), he may not act so as to derive a secret profit in the transaction even though his motives be pure, unless the other members have assented to the transaction or unless the transaction is entirely free from unfairness on his part. Id.
at 539; see also Belcher, supra, 348 F. Supp. at 115.
Irrespective of whether W.E. Prescott was in fact the managing partner or the arguments that ratification, estoppel, and majority rule make the various agreements binding upon Lees and DTK, the special master was authorized, by virtue of the circumstances and relationships involved, to vitiate those contractual arrangements which were consummated without the absolute good faith of A.E. Burgess and W.E. Prescott. The Court, therefore, finds no error on the part of the circuit court in accepting the special master's recommendation that all agreements between DTK and Burgess Mining or Burgess Brothers be set aside.
 VI. THE JUDGMENT AGAINST A.E. BURGESS
The circuit court, acting upon the recommendation of the special master, entered a judgment in favor of Lees for $9,451.83 against A.E. Burgess. A.E. Burgess argues that this judgment should be set aside. He states that all of the original partners withdrew as partnership distributions the total *Page 335 
sum of $40,752 (A.E. Burgess received $40,751), except Lees, who received $36,731. Burgess contends that if Lees receives a judgment of $9,451.83 in his favor, Lees would wind up receiving $5,431.30 more than any other partner.
Upon examination, the special master found that DTK's records and books indicated as of December 31, 1976, a balance in Lees's capital account of $5,216.13. The books showed credits for earnings during 1977 of $4,502.20 and $2,947, and a cash withdrawal of $3,231.50, leaving a net balance of $9,451.83 in Lees's account as of the time of the dissolution of the partnership. The special master further found that all the remaining funds and assets of DTK had been expended or paid out at the direction of A.E. Burgess.
The findings of a special master are accorded a presumption of correctness; the Court sustains the findings of the special master as to the judgment entered by the circuit court against A.E. Burgess.
 VII. OVERRIDE ON ROYALTIES AND THE SEGCO CLAIM SETTLEMENT
The special master made the finding that from January 1975, to March of 1976, DTK mined coal at a location leased from Calvin Jones. A.E. Burgess negotiated the lease on behalf of DTK that paid a $2.00 per ton royalty to Jones. After March 1976, DTK mined on property that had been leased by Burgess Mining and paid the royalty Burgess Mining was obligated to pay under the terms of the lease. Because some of the leases had been in existence for a long time, royalties, as provided for in the leases, were lower than the then-current rate. The special master noted that there was expert testimony in the record to the effect that a reasonable royalty for these leases when DTK mined them, i.e., an "override," would have been ten percent of the selling price (five percent going to the owner of the surface rights and five percent going to the owner of the mineral rights). Although there was conflicting testimony as to whether there was an actual agreement between DTK and Burgess Mining that DTK would pay an "override" on royalty, Burgess Mining sought $186,675 by counterclaim, the amount which it claimed it was owed by DTK for "override" payments. The special master pointed out, however, that assuming that DTK paid ten percent of its sales as royalty, it would only owe Burgess Mining $180,138.12.
In his report, the special master indicated that on May 26, 1977, Burgess Mining filed suit for a declaratory judgment against Southern Electric Generating Company (SEGCO) to determine the two parties' rights under certain agreements which allowed Burgess Mining to mine coal on the property of SEGCO following SEGCO's termination of the agreement. On April 14, 1978, the suit was settled by Burgess Mining's agreeing to pay $43,452.35 as additional royalties for coal mined from June 27, 1977, through March 31, 1978, and $16,462.41 as severance tax. The special master concluded that while DTK had mined some of the coal, DTK was not a party to the law suit or the agreements which were the subject matter of the legal action, and was not consulted during the process of settling the controversy.
As to the additional royalties which Burgess Mining claimed DTK owed it, the special master recommended: "It was the intention of the parties at the time, that DTK pay the same royalties that Burgess Mining paid and Burgess Mining is not entitled to recover on its claim for additional royalties set out in paragraph 2 of its counterclaim [SEGCO claim]."
While it may be customary for parties to agree, in certain instances, to an "override" royalty, Lees asserts that DTK was never charged more royalty on the coal it mined under Burgess Mining leases than Burgess was obligated to pay, and that DTK paid the royalties it was charged. As to the SEGCO settlement, Lees notes that while the defendants maintain that SEGCO and Alabama Power Company counterclaimed for royalties and a refund of severance taxes, the counterclaim was neither offered into evidence nor put before the special *Page 336 
master or the circuit court, and that the record is devoid of any explanation of the settlement. The testimony produced and facts shown at the hearing before the special master lead the Court to the conclusion that the special master's findings and recommendations concerning the additional royalties sought by Burgess Mining are properly supported.
 VIII. OTHER COUNTERCLAIMS AND DEFENSES
Burgess Mining and Burgess Brothers argue that the other counterclaims filed by them should have been allowed and not dismissed by the special master. The other counterclaims made by Burgess Mining were for:
 (1) The fair market value of ammonia nitrate over Burgess Mining's cost — $46,766.64;
 (2) the rental value of a lowboy on the basis of quantum meruit — $17,110.00; and
 (3) haul road maintenance cost and use on the basis of quantum meruit — $4,360.00.
Burgess Brothers had but a single counterclaim, which totaled $10,878, and that was for ad valorem taxes for which it claimed it was due reimbursement under the terms of the equipment leases.
Addressing the counterclaim for ad valorem taxes first, Burgess Brothers states that the equipment leases between it and DTK, executed on December 31, 1974, and April 1, 1977, include the following typewritten provision: ". . . Lessee (DTK) further agrees to reimburse lessor (Burgess Brothers) for any ad valorem taxes paid by lessor on a pro rata basis for the time the equipment is in possession of lessee." Burgess Brothers asserts that of the seventy-two months covered by the final assessment, DTK had possession of the equipment from January 1, 1975, through October 1977, and that it is thus due to recover from DTK $10,878 of the $23,037.41 in taxes it paid. Following the special master's filing of his report and recommendations, Burgess Brothers raised a question about DTK's obligation to pay the state taxes due on the equipment. In its supplemental objections to the special master's report, Burgess Brothers referred to the taxes as lease taxes and not as ad valorem taxes. The circuit court, however, overruled all the exceptions raised by all the defendants, including this one raised by Burgess Brothers.
It was established many years ago by this Court that a master is not authorized to make a report more extensive than the allegations and proofs warrant, Levert v. Redwood, 9 Port. 79, 94 (1830), and that exceptions to a master's report which have no foundation in the record or otherwise cannot be sustained.See Pearson v. Darrington, 32 Ala. 227, 238 (1858).
The equipment lease required DTK to pay ad valorem taxes. The taxes assessed by the Alabama Department of Revenue against Burgess Brothers, however, were not ad valorem taxes levied on the equipment but a privilege or license tax levied on Burgess Brothers' leasing or renting tangible, personal property, pursuant to §§ 40-12-220 through 40-12-227. Because the circuit court properly refused Burgess Brothers' objection to the fact that the special master's report did not include lease taxes assessed by the Revenue Department, Burgess Brothers was not entitled to the relief requested by its counterclaim.
The special master made no findings as to the haul road portion of Burgess Mining's claim; however, he did make the following conclusion and recommendation:
 "On various occasions Burgess Mining used equipment of DTK's and DTK used equipment of Burgess Mining. Except where charges were made, there was no intent to charge rent and the uses offset each other. Any materials purchased by DTK from Burgess Mining, including ammonia nitrate, were paid for at a reasonable price. Burgess Mining is not entitled to recover on any of the remaining claims in its counterclaim."
Burgess Mining predicated its counterclaims for the market value of ammonia nitrate, lowboy rental, and haul road *Page 337 
maintenance on the theory of quantum meruit. It has been said:
 "In the absence of an express agreement, the obligation, if any, to pay for work and labor rests on a quantum meruit, and may arise by legal implication without regard to the assent of the parties, on the theory or doctrine of unjust enrichment, or performance by one not a mere volunteer of a legal duty resting on another, or may result from a contract inferred or implied, in fact, or as a matter of law, or from quasi-contract. In determining the intention of the parties with respect to compensation for the labor performed, the court may consider the justice or injustice of a claim therefor."
98 C.J.S. Work Labor § 1, at 719-720 (1957); See also Greenv. Hospital Bldg. Authority of City of Bessemer, 294 Ala. 467,318 So.2d 701 (1975).
There was no finding by the special master that DTK was unjustly enriched to the detriment of Burgess Mining by DTK's purchase of ammonia nitrate or the use of the lowboy so as to entitle Burgess Mining to recover on its quantum meruit claims. Instead, the special master concluded from the facts, and we agree, that since DTK paid Burgess Mining a reasonable price for the ammonia nitrate and there was no intent on the part of Burgess Mining to charge rent on the lowboy, Burgess Mining was not entitled to recover on these claims. Although the special master made no findings or recommendation as to the haul road compensation claimed by Burgess Mining, a review of the facts and circumstances involved here convinces the Court that there was no reasonable expectation by either party that DTK would pay Burgess Mining for haul road maintenance, 98 C.J.S. Work Labor § 8 (1957), and that Burgess Mining's attempt to now obtain compensation constitutes nothing more than a change of mind for a service that was originally rendered gratuitously.Id. at 728. Consequently, the Court finds no implied contract, and sees no reason or justification to find an implied contract under the circumstances. See Green, supra, 294 Ala. at 470,318 So.2d at 704; therefore, recovery was properly denied on this counterclaim.
Collectively, the defendants raised as a defense, or at least a partial defense, the one-year statute of limitations. They assert:
 "Any claim arising against [A.E.] Burgess or Burgess Brothers or Burgess Corporation as a result of the acts of [A.E.] Burgess fall under the category of claims arising from `breach of fiduciary duty,' `breach of trust,' or fraud, and the one-year of statute of limitations should prevent recovery for any damages beyond those sustained during the period commencing October 19, 1976."
Lees filed suit on October 19, 1977, and withdrew from the partnership on October 26, 1977.
The statute of limitations does not run in favor of one partner or against another. Moore v. Moore, 255 Ala. 393,400-401, 51 So.2d 683, 689 (1951). Furthermore, there was no indication of undue delay on Lees's part in seeking redress against any of the named defendants that would operate as a bar to any remedy to which he is otherwise entitled. See Moore v.Moore, supra, 255 Ala. at 401, 51 So.2d at 690. Consequently, the defendants' argument as to the defense of the statute of limitations fails.
 IX. CROSS APPEAL AS TO INTEREST ON JUDGMENTS
In his report dated February 22, 1982, the special master recommended that the judgments entered in favor of Lees bear interest at 6% per annum from the date Lees delivered his letter withdrawing from the partnership, i.e., October 26, 1977. Subsequent to the special master's report, but prior to the circuit court's entry of a final judgment on September 15, 1982, the Alabama Legislature enacted Act No. 82-443, 1982 Ala. Acts 696, amending § 8-8-10 to raise the interest on judgments from 6% per annum to 12% per annum. The act became effective on May 4, 1982. 1982 Ala. Acts 696. Hence, Lees argues that in *Page 338 
view of Act No. 82-443, the judgments entered in his behalf should bear interest at 12% as opposed to 6% and that the circuit court erred by not modifying the recommendation of the special master when entering its final judgment. The consideration of the applicable rate of interest in this case warrants a discussion of the appropriate interest rate forprejudgment as opposed to postjudgment interest.
Section 8-8-1 states:
 "Except as otherwise provided by law, the maximum rate of interest upon the loan or forebearance of money, goods or things in action, except by written contract is $6.00 upon $100.00 for one year, and the rate of interest by written contract is not to exceed $8.00 upon $100.00 for one year and at that rate for a greater or less sum or for a longer or shorter time."
The legislature "otherwise provided by law" that postjudgment
interest, where no other rate is established by contract, should be 12% per annum. As amended, § 8-8-10 reads in relevant part:
 "Judgments for the payment of money, other than costs, if based upon a contract action, bear interest from the day of the cause of action, at the same rate of interest as stated in said contract; all other judgments shall bear interest at the rate of twelve (12) percent per annum, the provisions of Section 8-8-1 of the Code of Alabama 1975 to the contrary notwithstanding; . . ." (Emphasis added).
The legislature chose not to amend, but rather left unchanged, § 8-8-1, upon enactment and subsequent amendment of § 8-8-10.
Utilizing the general rules of statutory construction, we cannot read § 8-8-10, as amended, as providing for 12% prejudgment interest. No statute "otherwise provide[s]" for prejudgment interest at any other rate than the legal rate. Consequently, the Court holds that where, as in this case, no written contract controls the interest rate, thereby precluding the 8% rate of 8-8-1, the legal rate of prejudgment interest is 6% per annum. See Southern Security Services, Inc. v. Esneault,435 So.2d 1309 (Ala.Civ.App. 1983).
In this case, Lees is entitled to prejudgment interest of 6% from October 26, 1977, until the judgments were entered on September 15, 1982, and postjudgment interest of 12% thereafter.
 CONCLUSION The judgment of the circuit court is affirmed as to all issues, except the issue of postjudgment interest which is remanded for an entry of judgment consistent with this holding. In affirming the judgment, except for the interest issue, the Court finds it unnecessary to discuss the jury trial issue raised by Lees on appeal.
AFFIRMED, IN PART; REVERSED, IN PART; AND REMANDED.
TORBERT, C.J., and JONES, SHORES and BEATTY, JJ., concur.
[1] FIGURE I --------
BURGESS MINING 1975 1976 1977 TOTAL — ----- ------ -----
Coal Sales Due DTK (See Section IV) -0- $279,424.31 $109,040.83 Less: Management Fee -$7,524.13 -$ 28,417.66 -$ 13,039.76 Owed by DTK --------- ---------- ---------- -($7,524.13) $251,006.65 $ 96,001.07
Lees's proportionate Share of Adjustment x1/11 x1/15 x1/18 ------- ------- ------ ---------- -($ 684.01) $ 16,733.78 $ 5,333.89 $21,383.16
[The figures appearing throughout this opinion are taken from the record and the briefs filed in these appeals. This Court recognizes that in some instances the calculations appear not to be mathematically correct.]
[2] 1975 1/11 x $ 7,524.13 = $ 684.01 1976 1/15 x $28,417.66 = $ 1,894.49 1977 1/18 x $13,039.76 = $ 729.36 -------- $ 3,302.86
[3] Burgess Mining calculates this figure in the following fashion:
BURGESS MINING 1975 1976 1977 TOTAL — ----- ------ -----
Coal Sales Due DTK -0- $279,424.31 $109,040.80
Lees's Proportional Share of the Claim of DTK x1/11 x1/15 x1/18
Lee's Share of DTK claim -0- $ 18,628.27 $ 6,057.21 $24,685.45
----- ---------- -------- ----------
Less Burgess Corp. Counterclaim for Manage ment Fees ($7,524.13) ($ 28,417.66) $ 13,039.76 $48,981.55 ----------
Judgment for Burgess Corp. Against Lees $24,296.06
[4] The front end loader was actually leased to Burgess Mining by Thompson Tractor Company under a lease agreement. The equipment was later invoiced to Burgess Mining by the tractor company as if there had been a lease sale agreement.
[5] The bulldozer was leased to Burgess Brothers by Thompson Tractor Company under a lease purchase agreement.
[6] The dragline was purchased by Burgess Brothers from Simmons Machinery Company on an installment payment basis.
[7] Paragraph 16 (a) of the Partnership Agreement provides:
 "That if any partner shall elect to retire from the partnership or shall become so physically disabled as to be unable to attend to the business of the partnership or shall, for any reason, cease to be employed by Burgess Mining and Construction Corporation, or shall become deceased, then the partnership interest of any such individual partner will be offered to the remaining members of the partnership on a first option basis and should the remaining members elect to purchase such individual interest said continuing partners shall pay to such terminating partner, and such terminating partner or his legal representative, heirs, executors, or administrators as may be appropriate, will accept as payment in full for his individual interest an amount of money equal to the total of the following three separate amounts:
 "(1) The amount of his contributions to the capital of the partnership, less any losses thereto, that may have been sustained.
 "(2) One-eighteenth of the net profits that may have been earned between the date of the latest annual accounting of the partnership and the date of the occurrence of the termination of such retiring party, together with any other accumulated profits standing to the credit of such partner as then unwithdrawn."