[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 63 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 64 
Bentley Systems, Incorporated ("Bentley Systems"), and Bentley Systems Europe B.V. ("Bentley Systems Europe") (hereinafter referred to jointly as "Bentley") appeal from the trial court's judgment in favor of Intergraph Corporation and its subsidiaries (hereinafter referred to jointly as "Intergraph")[1] on Bentley's counterclaim against Intergraph. Intergraph Corporation cross-appeals from the trial court's judgment in favor of Bentley *Page 65 
Systems on Intergraph Corporation's amended complaint against Bentley Systems. The case was submitted to the trial court on a voluminous record consisting of stipulations, depositions, and exhibits. We reverse and remand with directions.
 I. Facts and Procedural History A. Overview of the Underlying Transaction
Bentley and Intergraph entered into an asset purchase agreement ("the APA") whereby Bentley purchased three software product lines from Intergraph. The product lines, known as the Civil, Raster, and Plotting (hereinafter referred to as "CRP") products, are software applications used by architects and engineers to prepare documents such as diagrams and blueprints. In conjunction with the sale, Bentley executed a promissory note in favor of Intergraph that was subject to future adjustments based upon the amount of certain revenues generated from the CRP products.
In addition to the CRP products, Intergraph transferred to Bentley a portfolio of maintenance agreements with its CRP customers and the exclusive right to convert those Intergraph agreements to maintenance agreements with Bentley. Maintenance agreements entitle users to product support and free upgrades. For products like the CRP products, which are geared to professionals, maintenance agreements represent an important recurring stream of revenue for software companies like Bentley and Intergraph.
 B. The Parties
Bentley Systems is a Delaware corporation; its principal place of business is in Exton, Pennsylvania. It is the parent corporation of Bentley Systems Europe, a Netherlands corporation and the principal subsidiary through which Bentley does business in foreign countries. According to the facts stipulated to by the parties, "Bentley is a developer of professional software products that it licenses to architects and engineers to design buildings and other public projects." Bentley's principal product is MicroStation, a computeraided design software program. Many of Bentley's other software products, including most of the CRP products acquired from Intergraph, require MicroStation in order to operate.
Intergraph Corporation is a Delaware corporation; its principal place of business is in Huntsville, Alabama. Intergraph Corporation is the parent corporation of the foreign subsidiaries listed in note 1, infra. According to the parties' stipulated facts, "Intergraph's business includes providing technical software products for process and power, utilities, communications, mapping and geographical information systems, photogrammetry, and public safety." In essence, Intergraph provides software for various technology-intensive industries.
 C. The APA
In November 1999, Intergraph and Bentley first discussed the sale of Intergraph's CRP products to Bentley. Because most of Intergraph's CRP products run on Bentley's MicroStation, the majority of Intergraph's CRP users were also existing Bentley customers, and the parties were confident that Bentley would be able to acquire substantially all of the CRP maintenance income stream within the year following the closing on the sale.
After signing a letter of intent on April 20, 2000, negotiating the terms of the contract for several months, and postponing the closing several times, the parties closed Bentley's purchase of the CRP products and maintenance agreements from Intergraph with the execution of the APA on December 26, 2000. Intergraph represented in the APA that of the $34 million in total revenue from its CRP products *Page 66 
in 1999, $20 million was derived from maintenance on the products. The purchase price for the CRP products consisted of (1) a cash payment by Bentley in the amount of $13,462,728; and (2) a promissory note executed by Bentley dated as of December 1, 2000. The amount of the cash payment is not at issue in this case. The note was given a preliminary value of $11,087,112 at the time of the closing and was to be adjusted based upon Bentley's success in transitioning the Intergraph maintenance agreements to Bentley's maintenance program called SELECT.
At the closing, Intergraph transferred all of its property rights in the CRP products to Bentley. All authority to sell new licenses for CRP products and to enter into new maintenance agreements on CRP products belonged solely to Bentley. Bentley hired 88 Intergraph employees, who were principally dedicated to the CRP products. Under the APA, Bentley actually provided the services under the maintenance agreements Intergraph had with the customer until each agreement expired or was due to be renewed. The APA was structured to provide for an orderly transition of the maintenance agreements on the CRP products from Intergraph to Bentley as the agreements expired or came up for renewal during the one-year period following December 1, 2000 ("the APA year"). The maintenance agreements for the CRP products were scheduled to expire in increments during each month of the APA year. After the closing, the APA required the parties to act jointly to solicit and encourage customers to renew their maintenance agreements solely with Bentley. The APA also required Intergraph to provide Bentley with detailed data regarding the maintenance agreements and to update that data at certain specific intervals.
Almost immediately after the closing, however, difficulties in complying with the provisions of the APA became apparent. Intergraph had difficulty compiling the data it had committed to provide to Bentley. Bentley discovered that much of the data Intergraph provided it was incomplete and/or inaccurate, a problem compounded when the data in the various updates furnished by Intergraph changed from submission to submission. In fact, the changes were so extensive that Intergraph never complied with a requirement in the APA that all changes in the updated data submissions be clearly marked. Furthermore, after the closing date, Intergraph, for its own account, continued to renew maintenance agreements on CRP products in the United States and in Europe. During 2001, Intergraph provided Bentley with lists of contracts Intergraph had renewed in the United States during the year, and paid Bentley 100% of the revenues it had collected on certain of those contracts that renewed during 2001. In April 2001, Bentley organized a CRP task force to address some of the foregoing problems. The goal of the CRP task force was to significantly increase the amount of new and renewed SELECT subscriptions for CRP products.
 D. The Promissory Note
The gravamen of this dispute is the calculation of the amount due under the promissory note. The value of the note as adjusted depended upon the calculation of what the APA refers to as transferred maintenance revenues ("TMR") and renewed maintenance revenues ("RMR"). Both TMR and RMR are defined terms under the APA, together with the corresponding note adjustments called for by the APA. TMR represented the revenues accruing from the maintenance agreements while those agreements were still in Intergraph's name. RMR represented the revenues accruing from the maintenance *Page 67 
agreements after those agreements were renewed by Bentley.
The calculation of TMR, according to section 7.1 of the APA, was based upon a schedule of transferred CRP maintenance agreements ("the TM schedule") furnished by Intergraph at the time of closing. The TM schedule Intergraph furnished when the APA was executed purported to provide Bentley with a list of all CRP maintenance agreements in effect in the United States as of October 31, 2000, and outside the United States as of July 31, 2000, "specifying without limitation, the products covered thereunder, the remaining terms thereof and the Maintenance Agreements that are scheduled to expire on or before the MCO Date." The TM schedule contained a projection of anticipated revenue for the 12 months following the closing. Multiplying this amount times 1.5 established the preliminary value of the note at closing at $11,087,112. Bentley began making monthly payments to Intergraph based upon that preliminary value.
After the closing, the APA required Intergraph to update the TM schedule to list all maintenance agreements in effect as of December 1, 2000, the maintenance cutoff date ("the MCO date"). This update was to occur in two steps, the first within 50 days of closing and the second within 150 days of closing. The APA required Bentley to adjust the note, retroactively to December 1, 2000, to reflect the total revenues listed on the 50- and 150-day updated TM schedules. Bentley was required to adjust the note on the 3-, 6-, and 14-month anniversaries of the MCO date. The first adjustment to the note was to occur on March 1, 2001, two weeks following the scheduled date for Intergraph's submission of the 50-day updated TM schedule, at which time the note was to be increased to 1.5 times the TMR shown on the 50-day update. The second adjustment to the note was to occur on June 1, 2001, one week following the scheduled date for Intergraph's submission of the 150-day updated TM schedule, at which time the value of the note was to be increased to 1.5 times the TMR shown on the 150-day update. The final adjustment to the note was to occur on February 1, 2002, at which time the value of the note was to be increased to 1.5 times the RMR.
Intergraph's 50-day updated TM schedule was due on February 14, 2001. On that date, Intergraph provided maintenance data for the Intergraph European subsidiaries directly to Bentley Systems Europe. Intergraph did not deliver the 50-day updated TM schedule to Bentley's corporate office in Pennsylvania until March 23, 2001. Based upon this data, Bentley increased the principal value of the note to $14,863,218 and also increased the amount of its monthly payments to Intergraph.
Intergraph's 150-day updated TM schedule was due on May 25, 2001. On that date, Intergraph again provided maintenance data for the Intergraph European subsidiaries directly to Bentley Systems Europe. Intergraph did not deliver the 150-day updated TM schedule to Bentley's corporate office in Pennsylvania on May 25, 2001, but instead, provided various files to Bentley throughout June and July. On July 26, 2001, Intergraph e-mailed maintenance data for the Asia-Pacific region to Bentley's corporate office. The updated schedules provided by Intergraph changed information about some of the maintenance agreements already on the schedule, including the ending dates of some of those agreements.
A third updated TM schedule was prepared as a result of a June 2001 meeting between Bentley and Intergraph in Hoofddorp, the Netherlands. The parties dispute the extent to which the information *Page 68 
contained in that schedule was to be used to compute the note value. Intergraph refers to that schedule as "the agreed-upon schedule." The trial court and Bentley refer to it as "the non-APA information." We will refer to it in this opinion as "the Hoofddorp TM schedule."
Various negotiations ensued. As a result of those negotiations, Intergraph submitted additional data to Bentley through October 2001. Bentley increased the principal value of the note in October 2001. On or about January 24, 2002, Bentley proposed a final note value of $21,214,808, calculated by multiplying 1.5 times TMR of $9,465,076 and 1.5 times RMR of $4,678,129 and adding the results. According to Intergraph, Bentley based its computation on a set of rules it had unilaterally constructed, which Intergraph says do not comply with the APA. According to Bentley, it was necessary to construct such rules to address situations not contemplated by the APA. Although Intergraph objected to the proposed note value of $21,214,808, contending that Bentley had suppressed the value of the note by approximately $3.05 million, Bentley began making monthly payments based upon its proposed final note adjustment. Bentley stopped making payments on the note in March 2003.
 E. Procedural History
Intergraph Corporation sued Bentley Systems in December 2002, seeking (1) a declaration of the principal value of the note, (2) a declaration of the amount owed by Bentley on the note, and (3) indemnification for litigation costs as provided under the APA. Bentley then filed a counterclaim against Intergraph alleging breaches of the APA. Bentley contended (1) that Intergraph failed to submit data updates required by the APA in a timely fashion, (2) that the data when submitted was incomplete and inaccurate, and (3) that Intergraph renewed CRP maintenance agreements for its own account. Bentley also sought indemnification for litigation costs as provided under the APA.
At the trial court's suggestion, the parties agreed to submit the case to the trial court on stipulations,[2]
depositions, and exhibits. The trial court heard oral argument from counsel on May 11, 2004, and announced its decision upon the conclusion of the argument. The trial court entered a judgment declaring that Bentley's calculation of the note principal, interest, and amount owed was correct. The trial court established the value of the note at $21,152,378 and concluded that Bentley owed Intergraph a balance of $7,539,944 on the note, allocating $6,769,934 to unpaid principal and $770,010 to accrued and unpaid interest. The trial court found in favor of Intergraph on Bentley's counterclaim. The trial court also awarded Intergraph and Bentley their respective litigation costs. Because Intergraph's legal expenses exceeded Bentley's legal expenses by $409,282.72, the trial court awarded the amount of the difference to Intergraph. The trial court entered a final judgment in favor of Intergraph on May 12, 2004. The judgment states in its entirety:
 "This matter comes before the Court on the Complaint and First Amended Complaint filed by Intergraph Corporation against Bentley Systems, Inc., and the Counterclaim filed by Bentley Systems, Inc. and Bentley Systems Europe, B.V. (together, `Bentley') against Intergraph Corporation and twenty-six[3] of its subsidiaries (collectively, `Intergraph'). *Page 69 
The Court set the matter for trial on April 12, 2004. Pursuant to the parties' agreement, the Court accepted this action for decision on submission of certain stipulated facts, evidence and post-trial briefs. The Court has received extensive evidence from the parties in the form of excerpts from depositions taken in the case and other documents and exhibits in both electronic and paper form. Last, the Court held a final oral argument on May 11, 2004 allowing the parties to argue their respective positions.
 "Having fully considered all of the evidence submitted by the parties, the legal standards under which this Court must evaluate the parties' claims and the pleadings in this case and the arguments submitted by the parties, it is hereby ORDERED, ADJUDGED AND DECREED that:
 "1. Intergraph is awarded a judgment in the amount [of] Seven Million Five Hundred Thirty Nine Thousand Nine Hundred Forty Four Dollars ($7,539,944.00), which includes Six Million Seven Hundred Sixty Nine Thousand Nine Hundred Thirty Four Dollars ($6,769,934.00) in principal, plus Seven Hundred Seventy Thousand Ten Dollars ($770,010.00) interest.
 "2. Intergraph is entitled to a judgment in its favor and against Bentley as to its claim set forth in its Amended Complaint for indemnification by Bentley for `Losses' as defined by the APA, to include litigation expenses, in the amount of Four Hundred Nine Thousand Two Hundred Eighty Two and 72/00 ($409,282.72).
 "3. Intergraph is entitled to a judgment in its favor and against Bentley as to each of the claims set forth in Bentley's Counterclaim.
"DONE this 11th day of May, 2004."
Both parties filed postjudgment motions. While the postjudgment motions were pending, Bentley delivered a check to Intergraph for $7,970,203.72, the full amount of the judgment entered against it plus postjudgment interest; Intergraph deposited the check. The trial court denied the postjudgment motions. Bentley then filed a notice of appeal. The docketing statement describes two issues: (1) whether the trial court erred in entering a judgment in favor of Intergraph and against Bentley on Bentley's counterclaim, and (2) whether the trial court erred in finding that both parties were entitled to attorney fees and costs and thereafter entering a judgment that was essentially a net award in favor of Intergraph. Bentley thus appeals only as to those aspects of the judgment awarding legal costs to Intergraph and denying relief on its counterclaim. Intergraph Corporation filed a cross-appeal challenging (1) the trial court's acceptance of Bentley's valuation of the note and Bentley's calculation of accrued but unpaid interest, and (2) the trial court's crediting Bentley an amount to compensate it for attorney fees and costs resulting from its alleged losses.
Intergraph has moved to dismiss Bentley's appeal based upon Bentley's having tendered a check to Intergraph. Bentley Systems has moved to dismiss Intergraph Corporation's cross-appeal based upon Intergraph's having deposited the check.
 II. Motions to Dismiss
We first address the motions to dismiss filed by both parties. Bentley has *Page 70 
moved to dismiss Intergraph's cross-appeal because Intergraph deposited Bentley's check in payment of the judgment. Bentley argues that Intergraph has accepted the benefit of the judgment, and, therefore, that its cross-appeal should be dismissed. SeeRice v. State Farm Fire Cas. Co., 578 So.2d 1064 (Ala. 1991); and Mobile Ins., Inc. v. Smith, 441 So.2d 894 (Ala. 1983), for the general rule that when an appellant accepts the benefit of a judgment, the appeal (or cross-appeal) from the judgment will be dismissed.
There are, however, exceptions to this general rule, as Intergraph Corporation points out in its opposition to Bentley's motion to dismiss. First, the acceptance-of-benefits doctrine does not apply when the party voluntarily pays the judgment. See, e.g., Garner v. Prewitt, 32 Ala. 13 (1858). Second, a party can maintain an appeal or a cross-appeal without refunding judgment proceeds if the opposing party will suffer no injury, especially in a case in which the party making the payment cannot recover less than the amount of the judgment paid in the event a new trial is ordered. See Alco Land Timber Co. v. Baer,289 Ala. 567, 269 So.2d 99 (1972).
Intergraph has moved to dismiss Bentley's appeal because Bentley satisfied the judgment entered against it. Making the same argument as Bentley made in its motion to dismiss, Intergraph argues that Bentley has accepted the benefit of the judgment, and, therefore, that its appeal should be dismissed. Although Bentley did not benefit in the traditional sense of having been awarded a judgment in its favor, Intergraph maintains, Bentley's voluntary payment of the judgment allowed it to receive the tangible benefits of the trial court's "set-off" of Bentley's legal expenses against Intergraph's legal expenses and payment of the judgment stopped the accrual of postjudgment interest on the judgment. Intergraph then states in its brief in support of its motion to dismiss: "While there is no dispositive ruling under Alabama law as to whether an appellant's payment of a judgment (rather than acceptance) acts to render his own appeal moot, a number of other jurisdictions hold that `the payment of a judgment under any circumstances bars the payer's right to appeal.'" (Quoting Lytle v. Citizens Bank of Batesville,4 Ark.App. 294, 296, 630 S.W.2d 546, 547 (1982), and citing additional cases from other jurisdictions.)
To the contrary, as Bentley points out in its opposition to the motion to dismiss, Alabama courts long ago decided the very issue articulated by Intergraph; those decisions are dispositive of Intergraph's motion. See, e.g., First Nat'l Bank of Birminghamv. Garrison, 235 Ala. 94, 97, 177 So. 631, 634 (1937) ("The rule has long obtained in this jurisdiction that mere payment of a judgment, or obedience to the mandate of the court, works no waiver of the right of appeal."). See also Mobile Ins., Inc.,441 So.2d at 897; and Moore v. Cooke, 264 Ala. 97, 84 So.2d 748
(1956).
Neither motion to dismiss is well taken, and both are hereby denied.
 III. Standard of Review
Our standard of review of this case is governed by statute. Section 12-2-7(1), Ala. Code 1975, states:
 "[I]n deciding appeals, no weight shall be given the decision of the trial judge upon the facts where the evidence is not taken orally before the judge, but in such cases the Supreme Court shall weigh the evidence and give judgment as it deems just."
In a case in which a trial court has not heard live testimony, this Court has held that "a reviewing court will not apply the presumption of correctness to a trial *Page 71 
court's findings of fact and that the reviewing court will review the evidence de novo." Eubanks v. Hale, 752 So.2d 1113, 1122
(Ala. 1999). Our statutory obligation in a case such as this is to "weigh the evidence and give judgment as [we] deem just." However, when resolving a conflict would require us to choose between alternatives of equal weight untested by the crucible of live testimony and cross-examination, the evidence cannot be weighed to reach a result in favor of one and against another without resorting to chance and speculation, a result inconsistent with the legislative command to reach a just judgment. We do not read § 12-2-7(1) as unambiguously imposing on us a duty to weigh the evidence even when doing so would reach an unjust result. See Leath v. Wilson, 238 Ala. 577, 579,192 So. 417, 419 (1939) ("The rule for interpreting an act of the legislature in this respect makes it the duty of the Court to harmonize and reconcile all parts of a statute so that effect may be given to each and every part: conflicting intentions in the same statute are never to be supposed or so regarded unless forced on the Court by unambiguous language.").
 IV. The Complaint (Intergraph Corporation v. Bentley Systems) — Calculation of the Principal Amount of the Note A. Terms of the APA and the Note
Section 2.2(c)(ii) of the APA states:
 "At the Closing, Bentley will issue a secured promissory note . . . (the `Note'), the principal amount of which shall equal the Preliminary Note Amount (subject to adjustment as provided below). The Note will be secured pursuant to a Security Agreement . . . (the `Security Agreement'). On the three-month anniversary of the MCO Date, the principal balance of the Note shall be adjusted up or down, effective as of the date of the Note, from the Preliminary Note Amount to an amount equal to 1.5 times the adjusted Transferred Maintenance Revenues. If [Intergraph] deliver[s] the Second Updated Schedule of Transferred Maintenance pursuant to Section 7.1, then on the six-month anniversary of the MCO Date, the principal balance of the Note shall be adjusted up or down, effective as of the date of the Note, from the Preliminary Note Amount (after giving effect to the adjustment referred to in the immediately preceding sentence and to all payments made prior to such adjustment) to an amount equal to 1.5 times the adjusted Transferred Maintenance Revenues. On the 14-month anniversary of the MCO Date, the principal balance of the Note shall be increased, as of the first anniversary of the MCO Date, by an amount equal to (x) 1.5 times the Renewed Maintenance Revenues, plus (without duplication) (y) 1.5 times the revenues attributable to the renewed CAD II Maintenance Agreements (i.e. those agreements with Intergraph) for the 12 month period following the MCO Date, and the remaining payments under the Note will be accordingly adjusted to amortize the balance of the Note in equal quarterly payments for the remaining term thereof. . . ."[4]
Likewise, the note contains an acknowledgment that it was subject to the adjustments provided for in the APA. The note states:
 "On March 1, 2001, the principal balance owing under this Note shall, as applicable, be increased or decreased so as to equal one and one-half (1.5) times *Page 72 
the Transferred Maintenance Revenues, such adjustment to be effective as of the date of this Note (any increase in such principal amount being referred to as the `Additional Principal'). If an adjustment to the principal balance of this Note occurs pursuant to the terms of the Asset Purchase Agreement on June 1, 2001, the principal balance owed under this Note shall, as applicable, be increased or decreased so as to equal one and one-half (1.5) times the Transferred Maintenance Revenues, such adjustment to be effective as of the date of this Note. On February 1, 2002 the principal balance owing under this note shall be increased by an amount equal to one and one-half (1.5) times the Renewed Maintenance Revenues (the `RMR principal'), such increase to be effective as of December 1, 2001."
Section 7.1 of the APA defined TMR as follows:
 "The revenues set forth on Schedule 7.1 shall be net of any third-party costs and shall not include any maintenance revenues with respect to the MicroStation product, and shall reflect those revenues that will accrue under all of the Maintenance Agreements for the period (for each such agreement) from the MCO Date through and including the earlier of (i) the expiration of the current term of the Maintenance Agreement in question (treating any renewal date as an expiration date), and (ii) the first anniversary of the MCO Date, (such earlier date is referred to herein as the `Expiration Date'). Such Schedule 7.1 is referred to herein as the `Schedule of Transferred Maintenance.' The aggregate net maintenance revenues set forth on the Schedule of Transferred Maintenance for the period from the MCO Date to the Expiration Date is referred to herein as the `Transferred Maintenance Revenues.'"
We refer to "Schedule 7.1" and the "Schedule of Transferred Maintenance" as "the TM schedule" throughout this opinion. Section 7.3 of the APA defined RMR as follows:
 "For purposes hereof, `Renewed Maintenance Revenues' shall mean, with respect to the products included in the Acquired Assets, the monthly maintenance fees related to maintenance programs renewed with Bentley or BSI Netherlands, as applicable, after their respective Expiration Dates. Solely for purposes of calculating the Renewed Maintenance Revenues, the monthly maintenance fee . . . for each renewed Maintenance Agreement shall be assumed to be the same as it was in the calculation of Transferred Maintenance Revenues as of the first month after the MCO Date for the period (for each agreement) from the Expiration Date to the end of the first year after the MCO Date, notwithstanding the actual fee upon such renewal."
After the APA and the note were executed, Bentley and Intergraph attempted to adjust the note in accordance with the above-quoted provisions. They were not able to agree on the adjustments after extensive negotiations, and this lawsuit resulted.
 B. Conflicting Theories for Calculating the Value of the Note
Intergraph argues that the trial court erred when it accepted Bentley's calculation of the note principal. In performing its calculations, Bentley devised a set of rules it called "Rules for TM and RM" (hereinafter referred to as "the Bentley rules"). Bentley contends that the Bentley rules were necessary because several issues arose during the APA year that were not covered by the APA. Bentley's accounting expert retained for trial, W. *Page 73 
Dana Northcut, used the Bentley rules in confirming Bentley's calculation of the note principal. Intergraph contends that each of the issues addressed by the Bentley rules is addressed by the APA, making the Bentley rules unnecessary, and that the Bentley rules improperly exclude seven categories of maintenance-agreement revenue. Intergraph's accounting expert retained for trial, J. Lester Alexander III, calculated the note principal for Intergraph. In addition, he calculated the amount by which Intergraph contends each of the seven categories of revenue impermissibly lowered the note principal. For ease of reference, Alexander is hereinafter referred to as "Alexander(I)" so as to associate him with Intergraph, and Northcut is hereinafter referred to as "Northcut(B)" so as to associate him with Bentley.
 1. Original Versus Amended Database
RMR was to be calculated based on the number of maintenance agreements Bentley renewed during the APA year. Intergraph states that during the litigation Bentley produced two computer databases containing information on the maintenance agreements renewed by Bentley — an original database called CRP_data_RW.mdb and an amended database called CRP_data_RW_A.mdb. Intergraph states in its brief that both its expert and Bentley's expert concluded that the original database contained more complete renewal information. Nevertheless, Intergraph says, Bentley used the amended database in its calculation and thus failed to account for all of the maintenance agreements Bentley renewed during the APA year. Alexander(I) calculated that Bentley's use of the amended database impermissibly lowered the note principal by $369,245.
Bentley agrees that during discovery, it did produce two versions of its SELECT database, but that Intergraph has reversed the chronology of the databases. Bentley says that CRP_data_RW_A.mdb is a "snapshot" of the database when Bentley performed its note calculation and provided it to Intergraph on January 24, 2002. Thereafter, Bentley says, it continued to enter newly renewed contracts into the database, some of which were retroactive to the APA year. Bentley says that CRP_data_RW.mdb is a later version of the database and contains the additional contracts. By using CRP_data_RW.mdb, Bentley says, Alexander(I) erroneously included in his calculation contracts that Bentley
renewed after the conclusion of the APA year.
 2. "Part" Versus "Agreement" Renewal
Intergraph states that if Bentley renewed a single CRP part[5] or line item on an Intergraph maintenance agreement, the APA required RMR to be calculated as if all CRP parts or line items on the maintenance agreement were renewed. In other words, the note adjustment was to be made on an "agreement" basis rather than a "part" basis. See section 7.3 regarding the calculation of RMR, quoted in Part IV.A. of this opinion. Instead, Intergraph says, Bentley calculated the note value on a "part" or "line-item" basis. Intergraph states in its brief that Northcut(B)'s rationale for treating renewals on a line-item basis was that calculating renewals on an agreement basis was "impossible" and that the reason Bentley calculated renewals in that manner was that Bentley elected "not to maintain Intergraph's contract numbers in their [sic] records." Bentley's in-house counsel, David Nation, stated in an e-mail *Page 74 
to Bentley executives that he thought Bentley should "track CRP renewals that meet the technical definition for `Renewed Maintenance Revenues' under the purchase agreement" and that Bentley should track renewals "contract renewal-by-contract renewal as we go along." Alexander(I) calculated that Bentley's calculation of renewals on a part basis rather than an agreement basis impermissibly lowered the note principal by $847,100.
Bentley argues that if it had received timely and accurate information from Intergraph, it could have calculated the renewals on an agreement basis. Most significantly for the purposes of applying section 7.3, Bentley says, the contract numbers for particular customers changed from one updated TM schedule to another. Bentley argues that because it did not have a "static" TM schedule from which to track renewals, it had to develop an alternate tracking method that matched agreements by country, customer name, and product or part number. Bentley says that only where Intergraph's data prevented Bentley from identifying all of the products held by a customer did a difference arise between the method described in the APA and the method used by Bentley. Bentley criticizes Alexander(I)'s calculation because, Bentley says, he used the data in the Hoofddorp TM schedule, ignoring the fact that this data was not available to Bentley while the maintenance agreements were expiring and the fact that the APA did not permit the use of this data, and he included in his calculation of RMR maintenance agreements Bentley did not renew because of defects in Intergraph's data. Furthermore, Bentley says, Alexander(I) assessed RMR credit for multiple agreements where Bentley renewed one part number on one agreement listed on Intergraph's TM schedule and that part number also appeared on another agreement held by the same customer. Bentley says it dealt with that problem by giving Intergraph credit for every agreement the data actually permitted Bentley to renew.
 3. Resellers and Distributors
Section 7.1 of the APA required Bentley to adjust the note to account for maintenance agreements listed on the TM schedule (and its updates) that were in effect as of December 1, 2000. Section 1.1 of the APA defined "Maintenance Agreements" as "any and all written maintenance agreements containing obligations on the part of any of the Selling Entities to provide maintenance services for any of the Civil, Raster or Plotting products." In addition to providing software maintenance services directly to end users, Intergraph says, it also had maintenance agreements in effect on December 1, 2000, with certain resellers and distributors, who, in turn, serviced end users. Intergraph states that it listed those agreements on the TM schedule, but that Bentley excluded virtually all revenue from the maintenance agreements with resellers or distributors listed on its updated TM schedules. Moreover, Intergraph says, even though Bentley renewed the vast majority of these maintenance agreements, Bentley did not credit these renewals in its calculation of RMR. Northcut(B) stated that he could not point to any language in the APA that "precludes or should be interpreted as precluding resellers from being listed on the TM Schedule," stating only that Bentley's treatment of resellers and distributors complied with the Bentley rules. Alexander(I) calculated that Bentley's exclusion of renewals associated with resellers and distributors impermissibly lowered the note principal by $431,403.
Bentley disputes Intergraph's contention that it provided Bentley the data concerning resellers and distributers. Bentley *Page 75 
argues that Alexander(I) used a schedule of end users purchasing through resellers Intergraph produced to Bentley in October 2002, and that, thus, the information Intergraph provided was too late to be useful in transitioning renewals of maintenance agreements. The need for this information was significant, Bentley says, because when it purchased the CRP products, it did not acquire any rights to Intergraph's distribution arrangements for the products, but purchased only the right to renew maintenance agreements with the end users, or subscribers. Therefore, Bentley says, it needed timely additional information from Intergraph to be able to renew these contracts.
 4. Bentley's Cutoff Date
Although the APA did not specifically state how long Bentley should hold its books open to ascertain the maintenance agreements renewed during the APA year, Bentley chose December 15, 2001, as a cutoff date by which to determine the maintenance agreements renewed. Intergraph argues that by using a date only 15 days after the expiration of the APA period, Bentley excluded a significant number of agreements that were actually renewed within the APA year, but that had not yet been recorded in Bentley's computer system. Intergraph argues that because the final note adjustment was not scheduled to occur until February 1, 2002, Bentley's rule establishing December 15, 2001, as the cutoff date denied Intergraph proper renewal credit, especially in light of the fact that Bentley held its books open until January 15, 2002, for internal accounting purposes. Alexander(I) used January 31, 2002, the day before the note adjustment was to be made, to capture Bentley's renewals. He testified that Bentley's use of December 15, 2001, as the cutoff date rather than January 31, 2002, impermissibly lowered the note principal by $389,504.
Bentley argues that its selection of December 15, 2001, as the cutoff date was not arbitrary but was chosen because the longest delay Bentley experienced in entering an executed maintenance agreement into its computer system was two weeks. Bentley says it counted any SELECT contract entered into its system before December 16, 2001, with coverage start dates before December 1, 2001. Bentley contends that Intergraph accepted this methodology before it filed this action. Bentley relies upon e-mail discussions between David Nation and John Carter, a member of Intergraph's in-house counsel staff and the person Intergraph delegated as its principal contact with Bentley concerning the problems that resulted from the APA transaction. Attached to one of Carter's e-mails was a document generated by Carter entitled "Bentley-Intergraph CRP Note Negotiations" dated June 28, 2002, which Bentley quotes in part: "Intergraph accepts Bentley's cut-off of 15 December 2001, provided of course that this date was not knowingly used to inflict an economic injury on Intergraph."
 5. "Evergreen" Contract Renewal
Intergraph argues that Bentley improperly excluded revenue from those maintenance agreements whose estimated termination dates changed in the updated TM schedules. This issue arose in the context of what the parties refer to as "evergreen" contracts used in many of the European countries in which Bentley and Intergraph do business. Intergraph defines an evergreen contract as one that has no definite term. Instead of lasting a finite period, Intergraph says, an evergreen maintenance agreement does not renew, but continues until such time as one party takes affirmative action to terminate it. A typical evergreen contract can be terminated by either party's complying with a contractual notice provision, normally three *Page 76 
months' notice. Unlike most of Intergraph's maintenance agreements that expired on a definite date during the APA year, the evergreen contracts required Intergraph to terminate them before they could be transitioned to Bentley. Intergraph contends that both Intergraph and Bentley understood that the parties would coordinate the transition of the evergreen contracts on a country-by-country basis after the closing.
Intergraph states that it listed the evergreen contracts in the 50-day updated TM Schedule with what it refers to as "assumed" termination dates during the first quarter of 2001; however, the majority of those contracts were not, in fact, terminated during that first quarter. When it provided the 150-day updated TM Schedule, Intergraph says, it listed the evergreen contracts with a later assumed termination date, generally during the second or third quarter. Intergraph says the evergreen contracts were not terminated in the first quarter "due in part" to the fact that the APA closing was delayed until December 26, 2000, which did not allow enough time to provide the three-month notice required to terminate those contracts.
Bentley characterized as improper renewals those maintenance agreements with termination dates that changed between the updated TM Schedules and therefore did not credit Intergraph for TMR for the interval between the original estimated termination date and the later actual termination date. Intergraph insists that nothing in the APA precluded it from changing the estimated termination dates or required it to list estimated termination dates for evergreen contracts in the first quarter. Alexander(I) calculated that Bentley's exclusion of the interval between evergreen contract termination dates that changed between the 50- and 150-day updated TM schedules impermissibly lowered the note principal by $428,967.
Bentley characterizes Intergraph's argument concerning the evergreen contracts as saying that Intergraph could properly renew those contracts because the evergreen contracts did not actually "renew," but instead, the termination dates simply changed. Bentley contends that the evergreen contracts not only changed termination dates, but also changed contract number and pricing terms. Furthermore, Bentley says, Intergraph repeatedly informed it that price quotes had been issued for the evergreen contracts just as they had been for maintenance agreements with a definite term. Bentley contends that the argument Intergraph now makes in its brief — that the TM schedules only contained estimated termination dates for evergreen contracts — was never advanced during the APA year.
 6. Outstanding Quotes
Three months before a maintenance agreement expired, Intergraph's computer system generated and sent a quote to the customer whereby the customer could renew the maintenance agreement by signing and returning the quote. At the time of closing, Intergraph had issued hundreds of quotes to customers between October and December 2000 for the renewal of maintenance agreements expiring between January and March 2001. As customers accepted these quotes in the three months before closing, Intergraph says, it listed them on the updated TM schedules. Intergraph says that Bentley deemed the resulting contract extensions "improper renewals," despite what Intergraph characterizes in its brief as its "obligation to honor outstanding quotes accepted by its customers." The Bentley rules provided that if Bentley renewed a maintenance agreement for which a quote was outstanding at the time of closing, it gave Intergraph *Page 77 
RMR credit on the note; however, if Bentley did not renew the agreement, it did not consider that revenue in its note calculation. Intergraph argues that Bentley's position that the APA precluded Intergraph from accepting these outstanding quotes differed from Intergraph's reading of the APA and its understanding at the time of closing.
Intergraph relies upon discussions during the negotiation of the APA to support its position that it understood that it could honor the outstanding quotes received from its customers after closing. It also relies upon what it characterizes as a statement made by one of Bentley's employees, Neal Harville, but that is actually testimony from one of Intergraph's employees, Glenda Rodman, concerning a statement she says Harville made to Intergraph's contract administrators at a meeting shortly after the APA was executed. Rodman testified:
 "Q. And when you asked Mr. Harville about the outstanding quotes what did he tell you?
 "A. We talked about exactly how that was worded amongst the entire group that was there actually but Neal he felt that in good faith since those quotes were already in the customers' hands that we would not have to do anything to pull those back from the customer but that we did not need to do any additional quotes.
 "Q. And did you discuss whether the contracts on the quotes that were outstanding would be Intergraph contracts or Bentley contracts?
 "A. I don't remember exactly what was said. The impression I came away with is that we would let those contracts go like they were if the customer sent it back to us and that we would not renew anything in addition to those."
Intergraph states in its brief that, based on the meeting of the contract administrators, the APA language, and the negotiations with Bentley prior to closing, it did not withdraw previously issued quotes, but instead, it renewed those contracts and then "worked to migrate the customers to Bentley." Intergraph contends that even if it had been possible for it to have refused to honor the outstanding quotes, its refusal would have been harmful because customers would have been without maintenance coverage for a period until Bentley could renew their maintenance agreements and insists that it acted properly in honoring quotes issued to its customers prior to closing.
Intergraph acknowledges that the treatment of outstanding quotes for note-calculation purposes does not "fall squarely within the definition of Transferred Maintenance Revenues because [those contracts] were not technically in existence as of December 1, 2000." Instead, Intergraph argues, this issue relates to the extension of maintenance agreements that were in existence on that date. The purpose of the note, Intergraph says, was to compensate Intergraph for the period during which the maintenance agreements were held by Intergraph and for the period after which they were transferred to Bentley. Therefore, it reasons, Bentley's rule refusing to credit any agreements other than those actually renewed by Bentley was unreasonable. Alexander(I) calculated that Bentley's exclusion of maintenance agreements renewed by Intergraph after the MCO date pursuant to outstanding quotes that were not transitioned to Bentley impermissibly lowered the note principal by $333,575.
Bentley insists that any contract renewals by Intergraph were improper, including *Page 78 
those renewed pursuant to outstanding quotes. The APA, Bentley says, clearly and unambiguously prohibited Intergraph from renewing or entering into any new CRP maintenance agreements after the closing. Section 7.3 of the APA states:
 "[F]rom and after the Closing Date, [Intergraph] shall have no authority to and shall not take any action to enter into any new or renew any Maintenance Agreements between itself and any subscriber with respect to the Civil, Raster or Plotting products. . . . Bentley acknowledges that Intergraph has, prior to the date of this Agreement, provided price quotes in the ordinary course of its business relating to the renewal of maintenance services to certain of its customers whose Maintenance Agreements are scheduled to expire within 90 days following the date on which such price quotes were provided (the `Quoted Prices'). To the extent Bentley enters into Renewed Maintenance Agreements with such customers following the Closing, Bentley shall, for the term of the renewed Maintenance Agreements, provide maintenance services thereunder at the Quoted Prices, provided that such Quoted Prices were consistent with Intergraph's past practice."
(Emphasis added.) Because the APA is so clear, Bentley argues, Intergraph's understanding that it could honor outstanding quotes is irrelevant.
Bentley refutes the statement Intergraph attributes to Neal Harville by referring to an e-mail exchange between Intergraph employees dated January 25, 2001. That e-mail stated:
"Update
 "Neal Harville just called me and told me that in our last meeting together as a group, John [Wilhoite, an Intergraph executive] and Neal agreed that all the details regarding the maintenance renewals had not been worked out. Neal says that Bentley's stand is that they have already paid for any maintenance agreements with begin dates effective after the December signing of the Intgr/Bentley agreement. Bottom line — sounds like Intergraph is not going to be able to honor the maint [sic] renewal quotes with begin dates prior to 4/1/2000 [sic — 2001] like we had requested even though Bentley will honor the same pricing."
 7. The Hoofddorp TM Schedule
Intergraph defines the Hoofddorp TM schedule as a revised version of the 150-day updated schedule. Intergraph contends that the Hoofddorp TM schedule was prepared at Bentley's request and that Bentley agreed to the revenue amounts listed in that schedule. Intergraph says that Northcut(B) stated that the Hoofddorp TM schedule should not have been used in calculating the value of the note, then admitted that it had been used but that he did not know why. Intergraph alleges that Bentley used the Hoofddorp TM schedule only for those countries where the use of that schedule decreased the principal value of the note, i.e., France, Germany, Norway, and Portugal, but that Bentley rejected the Hoofddorp TM schedule for those countries where that schedule listed more CRP maintenance agreement revenue. Not only did Bentley agree to the preparation of the Hoofddorp TM schedule, Intergraph says, it worked side by side with Intergraph in preparing it. Alexander(I) testified that the Hoofddorp TM schedule should have been used in calculating the note principal and that Bentley's exclusion of data from that schedule impermissibly lowered the note principal. Alexander(I) calculated that Bentley's failure to use the Hoofddorp *Page 79 
TM schedule impermissibly lowered the note principal by $166,059.
Bentley argues that the Hoofddorp TM schedule was never intended to be a substitute for either the 50- or 150-day updated TM schedule. The only thing the parties agreed to during the Hoofddorp meeting, Bentley says, was that the data Intergraph had supplied up to that point was so deficient that Bentley had experienced extreme difficulty transitioning the CRP maintenance agreements to Bentley SELECT contracts. Bentley maintains that although the parties agreed that Intergraph would produce a new global update, they recognized that their discussions in Hoofddorp did not modify the APA in any way. Bentley says that in an e-mail between Nation and Carter about the valuation of the note, Nation explained Bentley's position that the only schedules the APA permitted to be used in calculating the note value were the 50- and 150-day TM schedules provided pursuant to the APA, and, Bentley says, Carter replied that Intergraph agreed that those schedules "must therefore, be the sole basis for determining the Note's `bottom line' TM value" and that "to use any other information would be inappropriate." The quoted language is actually contained in the document previously referred to as "Bentley-Intergraph CRP Note Negotiations" dated June 28, 2002, that was an attachment to the e-mail exchange between Nation and Carter. The full exchange concerning the use of the Hoofddorp TM schedule in the "note negotiations" document stated:
"Based upon Bentley's comment,
 "`The Transferred Maintenance that Bentley computed . . . was based only on the data that Ingr [sic] provided in its March and June Transferred Maintenance schedules delivered under the CRP acquisition agreement. Those schedules were the only permitted source for the computations under the agreement.
 "Intergraph is in agreement that those schedules (March and June), must therefore, be the sole basis for determining the Note's `bottom line' TM value. Correspondingly, being the `only permitted source for computations under the agreement' the figures provided in the aforementioned schedules must also be used to determine the final amount of TM `mix' owed by Intergraph. As the parties are in agreement, then to use any other information would be inappropriate.
"Determining the TM `Bottom Line'
 "From a straightforward rational standpoint, to use the aforementioned schedules as the `only permitted source for computations under the agreement' seems like a reasonable position to advocate. Unfortunately, such a position does not reflect a true understanding of the complexities involved in determining the TM's magnitude. . . . Simply put, the amount of data affected, and its collating, comprised a tremendously complex undertaking involving numerous international businesses and thousands of accounts. To expect no inaccuracies within this undertaking would be naive.
 "Nonetheless, in order to move forward in reaching closure on this particular issue, as stated above, Intergraph is prepared to accept the schedules as being `the only permitted source for the computations under the agreement'; however, Intergraph is not prepared to accept that Bentley can review these schedules, making arbitrary modifications as it sees fit yet not permitting Intergraph the same accommodation. Consequently, Intergraph rejects Bentley's approach of reclassifying reported TM as renewed maintenance (RM) and any other modifications that attempt to modify this information. *Page 80 
. . . This being the position expounded by Bentley, and agreed to by Intergraph, then the sum total of TM reported by Intergraph in the aforementioned schedules shall be used for determining the TM component of the Note."
Bentley refutes Intergraph's assertion that it selectively used the Hoofddorp TM schedule to depress the value of the note by arguing that its use of a few files from the Hoofddorp TM schedule was caused by the "mass confusion" created by Intergraph's "haphazard production of data" and that its use of a few files does not justify the use of all of the information on that schedule to value the note, especially after Intergraph recognized that it was inappropriate to do so.
 8. Other Differences
Intergraph states in its brief that Bentley also lowered the value of the note by what it categorizes as "general errors, not assignable to a specific category" of $249,982. The Court's examination of Alexander(I)'s report and its own calculations reflect that this figure combines the amount Alexander(I) calculated had lowered the note principal as a result of Bentley's omitting data from the Hoofddorp TM schedule — $166,059 — plus $83,925 that Alexander(I) characterizes as "other differences" that lowered the note principal.[6]
Alexander(I) states in his report that "other differences" consisted of Bentley's "exclud[ing] certain product groupings . . . and customers which were listed on the Schedules" from its calculation of TMR, "includ[ing] revenues of certain product groupings . . . that were not reported by Intergraph on the Schedules," and "assign[ing] different values to line items submitted on Schedules (rather than use the revenue figures listed)." Bentley does not discuss these "other differences" in its brief.
 9. The Parties' Conclusions a. Intergraph
Combining the seven errors discussed above (to which must be added the "other differences" of $83,925), Intergraph concludes that Bentley's rules suppressed the value of the note by $3.05 million. The Court calculates the exact figure as $3,049,768. Intergraph argues that the principal value of the note as calculated by Alexander(I) should have been $24,861,931. Intergraph contends that it provided Alexander(I) with no instructions and asked him to make no assumptions about the requirements of the APA or of the note; therefore, it characterizes Alexander(I)'s calculation as "the only independent valuation presented to the trial court." Intergraph says that Alexander(I) analyzed both the TMR and RMR components, used the latest TM schedule submitted for each country (including the Hoofddorp TM schedule), verified the maintenance agreement data for accuracy, and arrived at his own conclusions about how the note should be calculated under the APA. In contrast, Intergraph says, Northcut(B) did not state which data or categories of revenue should be included in TMR or RMR, but instead, accepted Bentley's "rules and treatments as correct without making an independent determination of their correctness."
 b. Bentley
Bentley argues that the trial court properly accepted its calculation of the principal value of the note and insists that its calculations were in accordance with the APA despite Intergraph's alleged breaches of the contract. Northcut(B), Bentley says, audited and confirmed its calculations, arriving at a final note valuation of $21,152,378, which differed from Bentley's *Page 81 
own calculation by only $28,883. Intergraph's accusation that Northcut(B) did not perform an independent analysis is baseless, Bentley says, pointing to Northcut(B)'s testimony that his analysis was independent of Bentley and that he satisfied himself that the materials, documents, and information provided were reliable. In contrast, Bentley argues, Alexander(I) ignored clear definitions in the APA.
 C. This Court's Conclusions
The Court's task in this case is difficult. Because the parties, urged to do so by the trial court, agreed to submit the case on stipulations and documentary evidence, we are confronted with the daunting challenge of de novo review of what the parties refer to in their briefs as "the avalanche of facts and data in this case" and a "virtual mountain of evidence." De novo review is an extraordinary undertaking in a case of this magnitude, one for which an appellate court is ill suited without the assistance of testimony taken before a trial court that has the advantage of seeing and listening to the witnesses and questioning them, if it sees fit, on areas where the cold record of conflicting evidence is in equipoise. Nevertheless, we cannot shirk our statutorily imposed responsibility to conduct such a review in the present posture of this case, to the extent consistent with our obligation to enter a judgment we deem just pursuant to §12-2-7(1).
After reading the reports and depositions of both experts, Alexander(I) and Northcut(B), we conclude that we cannot accept either calculation in its entirety. Neither expert adequately explained his theories and methodology in the case; therefore, we find neither's conclusions reliable. The APA provides significant guidance that allows us to make certain conclusions, but after reviewing all of the evidence before us, we find ourselves unable to resolve all of the competing arguments in this case. Some of the issues concerning the note valuation can be disposed of based upon what we conclude are unambiguous provisions in the APA. Others, however, depend on disputed facts this Court finds impossible to resolve based upon a cold record and a total absence of any factual findings made by the trial court.
 1. Original Versus Amended Database
The parties' positions on which database should have been used to calculate the value of the note are diametrically opposed. Intergraph's statement in its brief that both experts agreed that CRP_data_RW.mdb was the appropriate database to use for the calculation is incorrect. In his deposition, Northcut(B) stated: "The data table that's relevant for purposes of calculation of both RM and TM is in the RW_A file. It's the — I'm sorry. The CRP_data_RW_A. That's the table. That's — that's the basis for both the calculation of RM and TM." On the other hand, Alexander(I)'s report identifies CRP_data_RW.mdb as the appropriate database to use for the calculation. This Court cannot make credibility determinations as to this issue on the record before it.
 2. "Part" Versus "Agreement" Renewal
The Court finds that this issue is governed by section 7.3 of the APA, which provides:
 "[T]he monthly maintenance fee . . . for each renewed Maintenance Agreement shall be assumed to be the same as it was in the calculation of Transferred Maintenance Revenues as of the first month after the MCO Date for the period (for each agreement) from the Expiration Date to the end of the first year after the MCO Date, notwithstanding the actual fee upon such renewal." *Page 82 
(Emphasis added.) Bentley recognizes that this provision controls, as its in-house counsel acknowledges. Bentley's justification for tracking renewals by parts rather than by agreements is that its problems with the data supplied by Intergraph made it necessary for it to develop another method for tracking renewals. While that reasoning is applicable to Bentley's allegations in its counterclaim that Intergraph's breach of the APA created insurmountable difficulties for Bentley, it does not excuse Bentley from clear contract language. We conclude that Bentley must track its renewals on an "agreement" rather than a "part" basis for purposes of the valuation of the note. We will discuss this issue further in Part V of this opinion.
 3. Resellers and Distributors
The definition in the APA of "maintenance agreement" clearly is broad enough to encompass the maintenance agreements that Intergraph had in place with the resellers and distributors. The dispute as to this issue is whether Intergraph disclosed to Bentley the existence of those agreements. Intergraph's counsel states that it did; Bentley's counsel states that it did not. The experts do not assist us. Northcut(B) applied the Bentley rules in making his computations, which excluded those agreements; Alexander(I) used the Hoofddorp TM schedule, the applicability of which is disputed by the parties. This Court cannot make credibility determinations as to this issue on the record before it.
 4. Bentley's Cutoff Date
The APA is silent as to a cutoff date for ascertaining the total CRP maintenance agreements renewed by Bentley. Intergraph contends that December 15, 2001, two weeks after the conclusion of the APA year, was unreasonable, but that January 31, 2002, the day before the note adjustment was scheduled, was reasonable. Bentley, of course, insists that it had a rational basis for choosing December 15 as the cutoff date, and also argues that Intergraph accepted the use of that date. The only evidence of Intergraph's acceptance that Bentley provides, however, is contained in the "note negotiations" document dated June 28, 2002, previously discussed in Part IV.B.4. of this opinion, which was attached to e-mails between David Nation and John Carter. While Carter does state that Intergraph will accept the December 15, 2001, cutoff date, he also makes an argument that December 31, 2001, would be a more appropriate date. The full text of that portion of the "note negotiations" document states:
 "Intergraph is not opposed to Bentley setting a cut-off date that is reasonable, reflective of its `standard closing date' or otherwise. However, this date is not considered reasonable if it significantly adversely affects the calculation of the RM component of the Note and directly contradicts the terms of the APA.
 "The problem of setting an arbitrary cut-off date for posting renewals is the natural incentive existing to have renewals subject to the APA posted within December, but after this earlier closing date. If a renewal was posted in the month of December, but after the fifteenth (15th), there is no adverse impact to a customer's maintenance coverage[;] however Bentley saves the 1.5 times impact thereof. Therefore, to remove any question of account manipulation, the cut-off date for reporting renewals coming into existence as of 30 November 2001 should be 31 December 2001. . . . "More to the point, per the APA, section `7.3,'
 "`Within 30 days after the first anniversary of the MCO Date, Bentley shall provide Intergraph with a list of *Page 83 
all subscribers from the list of subscribers described in the Schedule of Transferred Maintenance who have renewed such maintenance programs.'
 "This date is clearly 31 December 2001. If the parties are to adhere to the unambiguous terms of the APA, then the cutoff date must be remain [sic] as contemplated and contracted. Nonetheless, Intergraph accepts Bentley's cut-off date of 15 December 2001, provided of course that this date was not knowingly used to inflict an economic injury on Intergraph."
We find that e-mail insufficient to establish conclusively that Intergraph accepted December 15 as the cutoff date, and we cannot make credibility determinations on the record before us to otherwise determine whether Intergraph accepted December 15 as the cutoff date. If Intergraph did not accept December 15, 2001, as the cutoff date, Bentley's use of that date was not reasonable because the record reflects that Bentley did not capture certain maintenance agreements actually renewed during the APA year. Likewise, Intergraph's use of January 31, 2002, as the cutoff date was unreasonable because it would not have allowed any time for computations to the note adjustment that was due on February 1, 2002. Unless the trial court concludes that Intergraph accepted December 15, 2001, as the cutoff date, the use of any other date found reasonable by the trial court that would have provided ample time for computations to the note adjustment that was due on February 1, 2002, will require recalculation of this aspect of the note.
 5. "Evergreen" Contract Renewal
The issue concerning the evergreen contracts is a difficult one that apparently neither party fully contemplated before executing the APA. Although the evergreen contracts were capable of being transitioned from Intergraph to Bentley, the process was necessarily different from the process used to transition the more traditional maintenance agreements. Our review of the evidence indicates that had Intergraph been more forthcoming to Bentley about the terms of the evergreen contracts and acted promptly in giving the notice required to terminate them, the use of "estimated" termination dates in the various TM schedules could have been avoided. Although we find that Intergraph's actions in this regard are a factor in Bentley's breach-of-contract claim against Intergraph, Bentley should not have used those actions to penalize Intergraph in valuing the note. Therefore, we conclude that Bentley's decision to disallow credit to Intergraph for the interval between the initial estimated termination date of an evergreen contract and the later more accurate date, unless Bentley renewed the contract, was unreasonable in light of the fact that Intergraph did not actually "extend" or "renew" those contracts. Bentley should have given Intergraph credit for those intervals in valuing the note. Although we reject Bentley's disallowance of credit for the intervals in valuing the note, we find that Intergraph's actions concerning the evergreen contracts breached the APA and are a factor that must be taken into consideration in Bentley's breach-of-contract counterclaim against Intergraph. We will discuss this issue further in Part V of this opinion.
 6. Outstanding Quotes
The Court finds that this issue is governed by the clear provisions in section 7.3 of the APA that govern outstanding quotes. Intergraph's arguments attempting to justify its conduct in renewing CRP maintenance agreements for which quotes had been issued are disingenuous at best, in light of the absolute prohibition in the *Page 84 
APA against any renewals by Intergraph and Bentley's agreement to honor outstanding quotes so long as the maintenance agreements to which they applied were renewed by Bentley. These provisions are quoted in Part IV.A. of this opinion. Although we recognize that the outstanding-quote provision created difficulties for Intergraph, that fact does not excuse Intergraph from clear contract language. We conclude that Bentley properly excluded from the note valuation any maintenance agreements renewed by Intergraph after the MCO date pursuant to outstanding quotes. We will discuss this issue further in Part V of this opinion.
 7. The Hoofddorp TM Schedule
The parties disagree on whether and to what extent the Hoofddorp TM schedule could be used to calculate the value of the note. Bentley is correct that the APA does not provide for its use. However, if Bentley agreed to its use, then we cannot categorically state that it cannot be used. Our review of the record indicates that the evidence concerning the use to which Bentley agreed to put the Hoofddorp TM schedule is conflicting. Further, we find that the "note negotiations" document previously referred to that was attached to e-mail correspondence between Nation and Carter is insufficient to establish conclusively that Intergraph agreed not to use the Hoofddorp TM schedule. This Court cannot make credibility determinations as to this issue on the record before it.
 8. Other Differences
Bentley has not disputed the amount Alexander(I) characterized as "other differences." We therefore conclude that Bentley should include this amount in calculating the value of the principal of the note.
 9. Conclusion
We conclude that the trial court erred in accepting in its entirety Bentley's calculation of the note principal. We also conclude that several of the issues raised concerning the proper valuation of the note cannot be determined without live testimony on the material issues from which reliable determinations as to credibility can be made. This Court is not equipped to take such testimony, even under the aegis of a de novo review. Therefore, we reverse the judgment insofar as it held that Bentley's calculations of the value of the promissory note were correct, and we remand the case with directions to the trial court to take steps necessary to resolve the disputed issues and then to calculate the note principal in accordance with the guidelines set out above. The trial court's use of a special master experienced in such calculations and transactions and capable of navigating the extensive databases used in this case would certainly be warranted.[7] Because we cannot make a final computation of the note principal ourselves, we pretermit any discussion of the parties' arguments concerning the final balance owed on the note by Bentley. That balance must also be determined on remand consistent with the guidelines set out in this opinion. *Page 85 
 V. The Counterclaim (Bentley v. Intergraph) — Breach of the APA
We now turn to Bentley's allegations in its counterclaim that Intergraph breached the APA by failing to timely furnish the updated TM schedules, by furnishing incomplete and inaccurate data, and by improperly renewing CRP maintenance agreements.[8]
 A. Late Delivery of the Updated TM Schedules
Bentley first contends that Intergraph failed to comply in a timely manner with its obligation to furnish the CRP maintenance-agreement data to Bentley in the updated TM schedules called for by the APA at the 50- and 150-day intervals.
The initial TM schedule attached to the APA was a listing by Intergraph of its CRP maintenance agreements in effect as of a certain date (October 31, 2000, for the United States and July 31, 2000, for all other countries). Bentley contends that during the APA negotiations it tried to obtain an up-to-date list of the CRP maintenance agreements as of the MCO date, but that Intergraph represented that it could not comply with such a request. As a compromise, Bentley says, the parties structured the APA to allow Intergraph to update the TM schedule. According to this Court's review of the APA and the evidence before us, what was contemplated was that Intergraph would add to the initial TM schedule in February 2001 those additional maintenance agreements necessary to provide a comprehensive list to Bentley and in the event Intergraph learned in the ensuing months that agreements had been inadvertently omitted, it could finalize the TM schedule in May 2001. Section 7.1 of the APA states, in pertinent part:
 "Prior to the Closing, for purposes of calculating the principal amount of the Note on a preliminary basis . . ., [Intergraph] shall provide Bentley with a schedule (`Schedule 7.1') which lists all Maintenance Agreements in effect in the United States as of October 31, 2000 and in effect outside of the United States as of July 31, 2000, specifying, without limitation, the products covered thereunder, the remaining terms thereof and the Maintenance Agreements that are scheduled to expire on or before the MCO Date. . . . Within 50 days following the Closing, [Intergraph] shall use [its] good faith efforts to complete and shall provide to Bentley an updated Schedule of Transferred Maintenance setting forth all Maintenance Agreements in effect as of the MCO Date (the `Initial Updated Schedule of Transferred Maintenance'). The Initial Updated Schedule of Transferred Maintenance shall clearly show all changes from the initial schedule that was delivered at the Closing. *Page 86 
. . . If, despite [Intergraph's] good faith efforts, the Initial Updated Schedule of Transferred Maintenance does not reflect all Maintenance Agreements in effect as of the MCO Date, then [Intergraph] shall, within 150 days following the Closing, provide Bentley with a further updated Schedule of Transferred Maintenance (the `Second Updated Schedule of Transferred Maintenance') setting forth all Maintenance Agreements as of the MCO Date. The Second Updated Schedule of Transferred Maintenance shall clearly show all changes from the initial schedule that was delivered at the Closing and the Initial Updated Schedule of Transferred Maintenance."
(Emphasis added.)
It is undisputed that Intergraph did not comply with section 7.1 concerning the delivery of the TM schedules. The 50-day updated TM schedule was over a month late, having been due on February 14, 2001, and delivered on March 23, 2001. The 150-day TM schedule was due on May 25, 2001, but was never delivered as a comprehensive schedule. Instead, Intergraph provided various files to Bentley piecemeal throughout June and July. In the meantime, Bentley employees worldwide were attempting to transition the CRP maintenance agreements from Intergraph to Bentley without the proper information.
Although Intergraph was late with its comprehensive schedules, it did deliver some of the required data directly to Bentley Systems Europe in a timely fashion on February 14, 2001, and May 25, 2001. Bentley contends that such deliveries were nevertheless improper because the APA required all official communications made under the APA to be delivered to Bentley's corporate headquarters in Pennsylvania.
Section 11.6 of the APA concerning notices provides:
 "Any notices or other communications required or permitted hereunder . . . shall be deemed given if sent by registered or certified mail (postage prepaid), overnight delivery via nationally recognized courier, or facsimile transmission . . .; in each case addressed as follows:
"If to [Intergraph], to:
 "Intergraph Corporation "One Madison Industrial Park "Huntsville, Alabama 35894-0001 "Attention: John W. Wilhoite "Facsimile No.: (256) 730-2048
"If to Bentley, to:
 "Bentley Systems, Incorporated "690 Pennsylvania Avenue "Exton, Pennsylvania 19341 "Attention: David G. Nation, Senior Vice President and General Counsel "Facsimile No.: (610) 458-3181"
Even if we accepted Intergraph's theory that the 50- and 150-day updated TM schedules were not late because the required data was delivered on time to Bentley Systems Europe rather than to the corporate headquarters, the fact still remains that the data so delivered was only for certain countries and in no way complied with Intergraph's obligation to provide updated TM schedules for every country in which CRP maintenance agreements were to be renewed.
Intergraph's own expert witness testified that Intergraph did not comply with the deadlines set in the APA.
 "Q. Is it your understanding that the APA provided for two updates of the transferred maintenance schedule?
 "A. It's my understanding that the APA had an update process and it had dates. It's also my understanding *Page 87 
that those dates were not met.
". . . .
 "Q. . . . Did you understand that there was a third update to the transferred maintenance schedules that was made?
". . . .
 "A. There were several updates made. I mean, there was a bunch of them. So yeah. There was three.
 "Q. What do you mean by there were a bunch of updates?
 "A. The process as outlined in the APA in 7.1 and 7.2 did not occur. Okay? It did not occur. And a different process occurred."
 B. Incomplete and Inaccurate Data
Bentley next contends that when Intergraph did submit the data, it was incomplete and inaccurate. According to Bentley, key information necessary to transition maintenance agreements to Bentley was missing and key information changed from submission to submission, indicating that one or the other or both submissions were incorrect. Bentley maintains that what it describes as "late data" and "bad data" greatly frustrated its ability to create seamless maintenance transitions for its new CRP customers.
Timely and accurate data, Bentley says, was key to the smooth transition of any CRP maintenance agreement, requiring such information as the expiration or renewal date of the agreement, the contact person, and the products covered. Bentley personnel observed problems resulting from the inaccurate data early in 2001, reporting such problems as marketing mailings being returned because names or addresses were incorrect, inability to ascertain the correct contact person, inability to ascertain the correct business location in which to pursue renewal of the maintenance agreement, and the failure of certain data, for example, the number of CRP parts or licenses listed, to match the equipment or software the customer actually owned.
In addition to the problems associated with the incomplete and inaccurate data supplied by Intergraph, Bentley had to contend with a myriad of changes Intergraph made in each updated TM schedule submitted, changes that went well beyond the addition of agreements as contemplated by the APA. Bentley points out that the 150-day updated TM schedule was not intended to correct earlier mistakes, but was merely a safety net to allow Intergraph to supplement the 50-day updated TM schedule with any agreements that had been inadvertently omitted.
During the course of his work as Intergraph's principal contact concerning the APA, John Carter summarized the flaws in the data provided to Bentley in an e-mail exchange with a European Intergraph executive, Marc Krans.
 "Per the meeting that we held in April, it was agreed by the parties that serious questions remained as to the quality and extent of the data in the first update (referred to as the March submittal); therefore, a second update would be made by INGR. Per the APA, the second formal submittal (which is referred to as the July update), was suppose [sic] to have corrected any errors within the March submittal. However, it was known, even before being submitted, that the July update did not have all of the necessary corrections, as Bentley Europe and INGR Europe were continuing to update the data; hence the agreement (reached in in [sic] June), that the parties would continue definitizing the data." *Page 88 
Intergraph's director of finance at its European headquarters, Reinder van Weperen, acknowledged in an e-mail exchange with Carter in May 2001 that Bentley's complaints about the data were valid, although he also indicated that he thought Bentley was partly to blame.
 "The complaint that `Bentley is getting bad or inaccurate information' is true. Largely because of Bentley's own lack of initiative to arrange for the transfer of the billing responsibility, providing information has been like shooting at a moving target. When the information was submitted initially in August 2000, it was based on giving notice to the customers in [the third quarter]. Since Europe did not hear anything until December 28, business continued as usual. New information submitted in February was based on giving notice in [the first quarter]. The latest information submitted last week is — hopefully — based on having given notice in [the second quarter]!"
Erika Linsalata, a member of Bentley's CRP task force, testified about the problems that the inaccurate data and the changes in the data from update to update caused for Bentley.
 "Q. And you said you became aware of these issues [problems caused by inaccurate data provided by Intergraph] in February of '01. Had you received updated — well, do you know if there had been any updated data from Intergraph between February of 2001 and May of 2001?
"A. Yes. I am aware that there was more data.
 "Q. . . . [D]o you know . . . where that came from within Intergraph or how it got to Bentley?
 "A. No, I don't. Well, it got to Bentley I think through Bob Hewitt. . . . It's my understanding that when we got the first round of data that Intergraph said, `we're going to do some more work to get you more data.' So early — like, as we got through the month of February as people did contact me, I'd tell them, `I understand we're going to get more data. . . . That additional data we got, we started referring — I don't know if everyone called it this, but I know on the task force, we called it the St. Patrick's Day data. Since we called it that, I guess we must have gotten it roughly around St. Patrick's Day. But I don't have an understanding or recollection of the details in regards to the difference between the February and the March. I do know that St. Patrick's Day data didn't make our lives any easier.
 "Q. Did it contain any improved information or was it the same . . . information as what Bentley received in February?
 "A. I can't recall for certain. I think . . . that in some areas it was better. In other areas, it was worse. So when you look all and all, that made it even harder because now we had information we already had on our accounts in [Bentley's computer system]. Then we have February data that had some information but not all good. Then we had the March data which had some good information but not all. So now we had to spend time saying account by account what's the most recent up-to-date info that we should work off of."
Other Bentley employees made similar complaints about the extra work caused by Intergraph's inaccurate data submissions, the maintenance agreement renewal opportunities that Bentley lost, and the difficulties *Page 89 
created by the changes in the updated TM schedules.
 C. Improper Renewal of Maintenance Agreements
Finally, Bentley contends that Intergraph repeatedly renewed CRP maintenance agreements for its own account contrary to the express prohibition against such renewals in the APA. Bentley faults Intergraph for renewing agreements for which quotes had been issued before the APA closing and for its handling of the evergreen contracts in Europe. Bentley states in its brief to this Court that Intergraph admitted in its answers to interrogatories that it renewed more than 675 agreements after the APA closing. Further analysis of Intergraph's maintenance data shows, Bentley says, that after the closing Intergraph renewed 329 agreements in the United States, representing over 14% of the 2,287 maintenance agreements in place, and renewed 1,794 agreements outside the United States, representing 40.4% of the 4,436 maintenance agreements in place. After Bentley discovered that Intergraph was renewing agreements for its own account, Intergraph made arrangements to repay Bentley the revenue Intergraph had collected from those agreements.
John Carter acknowledged in an e-mail exchange with David Nation in May 2001 that Intergraph had renewed agreements after the APA closing. He stated:
 "To the issue of stopping the renewal and/or billing `beyond the expiration dates of the contracts', I believe that for the most part this matter is being addressed, particularly for the United States — although there is certainly some room for improvement. As for our subsidiaries, there does appear to be some level of noncompliance — which is most likely cause [sic] by confusion on their part as to fully understanding the details of the [APA]. I am in the process of `reeducating' each of the Company's major regional leaders, and as necessary, with the individual Intergraph country manager."
We reject Intergraph's attempt to justify its renewal of agreements based upon outstanding quotes and its delay in resolving the issues presented by the evergreen contracts. Our review of the record supports Bentley's contention that Intergraph renewed a significant number of agreements despite Bentley's complaints about that activity. Most of those renewals were based upon Intergraph's self-serving interpretation of the APA concerning what Intergraph perceived as its right to renew agreements for which quotes had been issued. Intergraph also created problems for Bentley's renewal efforts with the evergreen contracts. Intergraph had an obligation to inform Bentley of all CRP maintenance agreements the term of which extended beyond the APA year. All of the evergreen contracts should have been listed; none were. When Bentley began complaining about the changing renewal dates on those contracts in the updated TM schedules, Intergraph began to take action to terminate the contracts so that they could be transitioned to Bentley. However, in many cases, Intergraph simply terminated the evergreen contracts without providing Bentley with the information necessary to allow Bentley to pursue the renewal of the contracts in time to forestall any gaps in maintenance coverage. Intergraph's activities in this regard were more pronounced in its foreign subsidiaries where, in the words of Intergraph's chief executive officer, those responsible for complying with the APA disapproved of the APA and feigned misunderstanding rather than taking the appropriate steps to comply with it. See *Page 90 
Part IV of this opinion for further discussion of the issues concerning outstanding quotes and the evergreen contracts.
 D. The Trial Court's Conclusions
During oral argument, the trial court discussed with the parties three grounds it had concluded could prevent Bentley from recovering on its counterclaim: waiver, immaterial breach, and substantial performance. Bentley argues that none of those grounds supports the trial court's judgment in favor of Intergraph on its counterclaim. Intergraph has offered no argument in support of any of these grounds.
 1. Waiver
The trial court opined that Bentley's acceptance of additional maintenance data after the dates on which the 50- and 150-day updated TM schedules were due waived its breach-of-contract claim. Bentley contends that the updated Hoofddorp TM schedule on which the trial court based its waiver theory was provided to Bentley long after the APA deadlines had passed, that it was itself erroneous, and that it failed to correct all of the deficiencies in the previous data submissions. Although Bentley's use of this data mitigated its damages to some extent, Bentley says, it certainly did not waive Intergraph's previous breaches of the APA. Correspondence from Bentley to Intergraph makes that point clear:
 "Nothing in our meeting [in Hoofddorp] or the attached written summary was intended or should be read to modify or otherwise change the CRP contracts, which will continue to govern all issues relating to the transaction."
Finally, Bentley says, section 11.8 of the APA required any waiver of its terms to be in writing. Section 11.8 states:
 "The observance of any term of this Agreement may be waived . . . by the party entitled to enforce such term, but such waiver shall be effective only if it is in writing signed by the party against which such waiver is to be asserted."
 2. Immaterial Breach
The trial court suggested that because Intergraph eventually provided data after the APA deadlines, any breach of contract it committed would have been immaterial. Bentley contends that Intergraph's breaches of the APA were material, striking, it argues, at the core of the contract. The CRP maintenance agreements were the most significant asset covered by the APA, Bentley says, and Intergraph's failure to provide timely, complete, and accurate data, together with its improper renewals of maintenance agreements, threw Bentley's transition efforts into disarray and caused Bentley to spend additional effort and expense to salvage the anticipated renewals of CRP maintenance agreements with minimum lapses in coverage. Even if Intergraph's breaches of the contract could be considered immaterial, Bentley argues, Intergraph would still be liable for damages to a certain extent.
 3. Substantial Performance
Bentley argues that the trial court also misapplied the doctrine of substantial performance. Substantial performance is not a defense to a breach-of-contract claim, Bentley states, but permits a recovery for a breach of contract by a party that has not performed all of its obligations under a contract so long as its performance has been substantial, citing Bay CityConstruction Co. v. Hayes, 624 So.2d 1031 (Ala. 1993). Bentley argues that Intergraph is not positioned here to invoke the doctrine of substantial performance in relation to Bentley's counterclaim because it is not the party seeking relief, and that the doctrine of substantial performance *Page 91 
simply has no applicability to the facts of this case.
 E. This Court's Conclusions
This Court has spent considerable time and effort reviewing the voluminous record in this case. After doing so, we have come to the inescapable conclusion that Intergraph did indeed breach the APA in the manner outlined by Bentley. The transaction undertaken by the parties was a complex one involving worldwide businesses with thousands of customers, and it is readily apparent that neither party fully appreciated the difficulties that resulted from the deal they struck. Nevertheless, the parties negotiated for and executed the APA, and the fact that complying with its provisions turned out to be more difficult than they had anticipated does not excuse their noncompliance. When sophisticated business entities negotiate and execute a contract with one another, they should not expect a court to extricate them from the bargain they have made. In this case, Bentley has found the computation of the note principal difficult, but as discussed in Part IV of this opinion, that computation must be governed by the APA provisions. Intergraph, on the other hand, found itself unable to compile in an accurate and timely fashion the data that it had agreed to provide to Bentley. Intergraph also renewed CRP maintenance agreements in violation of what this Court considers to be a plain and unambiguous provision in the APA that flatly prohibits such renewals on Intergraph's part.
A telling portion of the evidence in this regard are communications from Intergraph's own personnel.
In his deposition, Larry Miles, an Intergraph executive, testified about the extent of the changes contained in the 50-day updated TM schedule furnished by Intergraph:
 "Q. I want to turn to the original e-mail that you sent to Mr. Nation. . . . [Y]ou begin by saying to Mr. Nation that you have all the details required for CRP maintenance. What are you referring to?
 "A. This is related to the transferred maintenance schedules.
 "Q. Is that related to the first update of transferred maintenance?
"A. I believe so, yes.
 "Q. And you say it's in a form you should be able to use but it's not marked for changes as specified in the APA. What does that refer to?
 "A. The schedule was a complete redo of the schedule that was done as to the placeholder and therefore what I was trying to communicate here was you need to take this as the schedule and ignore the original, the thing we had as a placeholder, because it's superseded in its entirety by this and this is the way that — just take this and start with it.
 "Q. And did you understand that the APA required the changes in the transferred maintenance schedule to be marked as compared to the initial schedule of transferred maintenance?
"A. Yes.
"Q. But you didn't do that?
 "A. Well, I handled that by saying it's all changed. You need to just start over again."
In May 2001, David Nation wrote to Larry Miles to complain about the problems Bentley had encountered.
 "Several issues under the CRP transaction agreements persist which are of the utmost urgency. In each case, it appears that the cause of the problem is the failure of Intergraph's foreign subsidiaries *Page 92 
(many of them) to comply with the agreements made on December 26, 2000. Our people in Europe [have] tried to resolve these issues with their local Intergraph counterparts. But, by now, the offenses have become so egregious and the inability or unwillingness to resolve them locally so apparent, that Bentley has no choice except to turn to Intergraph Huntsville for a prompt resolution.
 "The problems are twofold, and not new. First, Bentley is getting bad or inaccurate information (or none at all). Second, Bentley is not getting paid."
Miles forwarded Nation's e-mail to Intergraph's chief executive officer, James Taylor, who responded:
 "Sorry for the frustration. I believe that we have a problem and will commit the resources to fix it. I believe that our subsidiaries do not like the deal and are acting like they do not understand it rather than execute according to the agreement. I have assigned John Carter to work this issue. He will contact you to get any specific information or set up a visit if necessary. I will stay on top of this until it is on track."
In a May 2001 e-mail, Carter stated to Marc Krans:
 "In accordance with the terms of the Asset Purchase Agreement (APA), Bentley was required to undertake a re-evaluation of the Note against the update that was to be provided fifty (50) days from the MCO, unless there was a question over the validity of the information. In such an event, then a second update was to follow at one hundred and fifty (150) days from the MCO and the note adjusted against this latest update. (It is notable that for both of these submissions INGR was late in providing the data.)"
In October 2001, in an e-mail from Carter to Miles, Carter acknowledged Intergraph's breach of contract, while also stating his opinion that Intergraph had rectified any such breaches:
 "This entire process is very complicated at a number of levels. In all frankness, the deal has been further complicated by our failure to adhere to all of our obligations. This has in turn required a considerable amount of damage control on my part. However, based upon my last meeting with Bentley, it now appears that INGR has done an effective job of rectifying any prior or current deficiencies, and just as important, left Bentley without the basis for an effective claim of damages for any such non-compliance."
The difficulty in this case comes not from determining whether Intergraph breached the contract, but from determining questions such as to what extent did the breach occur, to what extent was Bentley damaged thereby, to what extent did Bentley's own actions contribute to the harm it suffered, and to what extent was Bentley able to mitigate its damages. As to those questions, the record reflects sharp factual disputes that we cannot resolve on a cold record consistent with our obligation to render a "just" judgment. § 12-2-7(1), Ala. Code 1975. For example, the parties dispute the reason for the creation of Bentley's CRP task force and its effect upon the CRP maintenance-agreement renewals. Bentley contends that when it realized how many problems had been created by Intergraph's failure to provide the data Bentley needed and realized that the level of CRP maintenance-agreement renewals was not meeting its expectations, it created the CRP task force to address the problems, to gather data in any way that it could, and to assist Bentley employees in transitioning maintenance-agreement *Page 93 
renewals to Bentley, thus mitigating the damages Bentley had suffered. On the other hand, Intergraph contends that the fact that Bentley did not create the CRP task force until late April or early May 2001 indicates that Bentley was not fully prepared to take over the CRP business and did not act quickly enough with the data that it had to transition the maintenance agreements.
Likewise, this Court cannot resolve the question of damages resulting from Intergraph's breach; that question is also sharply disputed by the parties and their experts. Northcut(B) calculated that Bentley's lost profits resulting from Intergraph's breach totaled $9,427,715. However, as previously stated, we find that Northcut(B) did not sufficiently explain the basis for his damages calculation in his deposition to allow us to accept his report without additional explanatory live testimony. Alexander(I)'s criticism of Bentley's damages calculation is likewise insufficient without additional explanatory live testimony.
Our review of the record compels us to agree with Bentley that the three grounds upon which the trial court based its conclusion that Intergraph should prevail on the counterclaim do not support its decision.[9] A waiver consists of a "voluntary and intentional surrender or relinquishment of a known right,"Dominex, Inc. v. Key, 456 So.2d 1047, 1058 (Ala. 1984), and the burden of proof in establishing a waiver rests upon the party asserting the claim. Murray v. Webster, 256 Ala. 248,54 So.2d 505 (1951). Whether there has been a waiver is a question of fact. Id. We find no waiver on Bentley's part. Furthermore, we find that Intergraph's breach of the APA was material. A material breach of a contract "is one that touches the fundamental purposes of the contract and defeats the object of the parties in making the contract." Sokol v. Bruno's, Inc., 527 So.2d 1245,1248 (Ala. 1988). Finally, Bentley is correct that the doctrine of substantial performance does not apply in this case. See BayCity Construction, supra.
Because we find that Intergraph breached the APA, we reverse the judgment insofar as the trial court held in Intergraph's favor on Bentley's counterclaim, and we remand the case with directions to the trial court to take steps necessary to resolve the disputed issues and then to calculate the damages Bentley sustained as a result of Intergraph's breach of contract in accordance with the guidelines set out above, using a special master in this aspect of the case, if necessary, as discussed in Part IV.C.9. of this opinion.
 VI. Attorney-Fee Award
In light of our disposition of the issues raised by the parties, we set aside the attorney-fee award for reconsideration by the trial court at the close of the proceedings on remand.
MOTIONS TO DISMISS DENIED; JUDGMENT REVERSED; AND REMANDED WITH DIRECTIONS.
NABERS, C.J., and WOODALL, SMITH, and PARKER, JJ., concur.
[1] The Intergraph subsidiaries named as defendants in Bentley's counterclaim are Intergraph (UK), Ltd.; Intergraph (Deutschland) GmbH; Intergraph (Switzerland) A.G.; Intergraph GmbH (Osterreich); Intergraph (France) S.A.; Intergraph (Sverige) AB; Intergraph CAD/CAM (Danmark) A/S; Intergraph Norge A/S; Intergraph Finland Oy; Intergraph Europe (Polska) Sp. z.o.o.; Intergraph CR spol. s.r.o.; Intergraph Espana, S.A.; Intergraph (Portugal) Sistemas de Computacao Grafica, S.A.; Intergraph (Italia), L.L.C.; Intergraph (Hellas) S.A.; Intergraph Benelux B.V.; Intergraph Benelux B.V. (Belgian Branch); Intergraph Corporation Pty. Ltd.; Intergraph Corporation (N.Z.) Limited; Intergraph Corporation Taiwan; Intergraph Industry Solutions Japan K.K.; Intergraph Korea, Ltd.; Intergraph Hong Kong Limited; Intergraph China Limited; Intergraph Canada Ltd.; Intergraph (Middle East) L.L.C. (Dubai UAE); Intergraph de Mexico, S.A. de C.V.; and Intergraph Servicios de Venezuela C.A. All of these entities were signatories to the contract at issue in this case. After that contract was signed, Intergraph Corporation sold Intergraph (Hellas) S.A. and Intergraph (Middle East) L.L.C. (Dubai UAE).
[2] This Court has used the parties' stipulated facts extensively in preparing the factual-background portion of this opinion.
[3] The trial court apparently did not include in this number the two subsidiaries that were sold. See note 1.
[4] The term "CAD II Agreements" is defined in the APA as certain specified contracts between Intergraph and the United States government.
[5] A "part" is the industry term for a software license. Most maintenance agreements cover more than one part.
[6] We note that adding these two figures together results in a total of $249,984.
[7] See Burgess Mining Constr. Corp. v. Lees,440 So.2d 321, 327 (Ala. 1983) ("At the outset, it is to be noted that a court accepts a master's findings of fact in non-jury actionsunless clearly erroneous; and to the extent the trial court has adopted the findings of a master, this same standard applies to an appellate review of these findings. Rule 53(e)(2), Ala. R. Civ. P., and committee comments to Rule 53, Rule 52, Ala. R. Civ. P., and committee comments to Rule 52. In essence, a master's report is accorded the same weight as a jury verdict and, therefore, is not to be disturbed unless it is palpably and plainly wrong. Patterson v. Lovelady, 233 Ala. 554, 556,172 So. 646, 648 (1937).").
[8] In a footnote in its brief to this Court, Bentley states that it also alleged in the trial court that Intergraph breached certain sections of the APA by failing to cooperate in taking all action necessary to transition to Bentley the assets acquired pursuant to the contract and to assure the orderly transition of the CRP maintenance agreements to Bentley. Bentley then states: "Due to the overwhelming evidence of Intergraph's other breaches, we do not discuss that conduct separately on this appeal. The various failures of Intergraph to cooperate are spelled out in Bentley's final brief in the trial court." To the extent that Bentley attempts to incorporate its arguments as to a fourth breach of the APA by Intergraph by reference to its trial brief, we reject any such incorporation. Incorporation into an appellate brief of arguments made in a trial brief is not proper procedure under Rule 28, Ala. R.App. P. See Hollis v. Forrester,914 So.2d 852 (Ala.Civ.App. 2004); Perry v. State Pers. Bd.,881 So.2d 1037 (Ala.Civ.App. 2003). We therefore do not consider Bentley's claim that Intergraph breached the APA by its alleged failure to cooperate.
[9] Interestingly, and as previously noted, Intergraph does not respond to any of the foregoing theories in its brief to this Court. Instead, Intergraph devotes its brief to arguments that it did not breach the APA. Because this Court finds, after reviewing the extensive evidence in this case, that Intergraph's breach of the APA is uncontroverted, we pretermit any further discussion of Intergraph's arguments in this regard. *Page 94